CASE 15—PETITION FOR MANDAMUS—JUNE 14.

# Maddox et al. vs. Graham & Knox.

*APPEAL FROM MASON CIRCUIT COURT.*

1. Where a city council is authorized and required by law to levy and collect a tax upon the real and personal property of the city sufficient in amount annually to pay off the interest upon bonds issued by the city in payment of a subscription of stock to a railroad company, and the council refuse to do so, and there is no specific legal remedy provided for non-performance, mandamus may be maintained to compel them to discharge that duty, at the instance of holders to whom the bonds have been passed by the company. An express and explicit refusal, in terms, is not necessary to put the defendants in fault; it will be sufficient that their conduct makes it apparent that they do not intend to do the act required.

2. Any of the bond-holders may apply for the writ, and it is not necessary that the others should be made parties. Nor is it necessary to make the railroad company to whom the bonds were executed, the tax-payers of the city, or the Commonwealth, parties to the proceeding.

3. That an action had been brought against the city upon the interest coupons, which was dismissed before judgment upon the mandamus, formed no obstacle to the granting of the writ.

4. Upon a motion for a writ of mandamus the answer of the defendant is traversable; the court has power to hear evidence controverting and supporting the statements of the answer, and to decide all questions of law and fact arising in the motion.

5. A motion for mandamus against a city council is virtually a proceeding against the corporation, and the judgment is obligatory on the members of the board of councilmen in office at the time of its rendition. It may assume the character of an individual proceeding, if it becomes necessary to enforce the orders of the circuit court by attachment or other process for contempt. But a change in the membership of the board does not so change the parties as to abate the proceeding. The constituent parts of the board may not be the same, but the representative body remains identical.

6. An act of incorporation is *an enabling act;* it gives to the body corporate all the power it possesses. With the directions of such acts there must be a compliance substantial and *bona fide;* and where a specific act is directed to be done by a particular *agent,* it must be done by *that* agent.

7. The act incorporating the Maysville and Lexington railroad company, and the amendment thereto, gave to the corporation of the city of Maysville power to hold stock in that company, to become indebted to the company for the stock subscribed, and to execute the bonds of the city to the company for the payment thereof.

8. Rules for the construction of statutes considered.

9. By the 28th section of the act incorporating the Maysville and Lexington railroad company, the board of council of the city of Maysville was appointed the "agent" of the city to make the subscription of stock to the company on the part of said city. It mattered little *who* actually signed the obligation in behalf of the city

Maddox et al. vs. Graham & Knox.

in the book of the railroad company, or whether there was such signature at all. The substantial and significant acts had been performed before.

10. That the bonds on the city of Maysville, issued by the city council, were made payable to "*the Maysville and Lexington railroad company*," when the act under which they issued provides that they should be made payable to the *president and directors of said company*, is no departure from the substance and essence of the mode prescribed by the statute.

11. The statute directed that the bonds, *supra*, should be negotiable and transferrable by the order of the president and directors of the railroad company. They were therefore properly made payable to the company, its "*assignee, or bearer.*" This was not only in accordance with the statute, but with the well known usage of the country in reference to such instruments.

12. No place having been fixed by the statute at which the bonds or coupons should be made payable, it was within the discretion of the city council, who could properly make them payable in New York.

13. The statute which authorized the issual of the bonds required the city council "to levy and collect * * * * an amount in money sufficient annually to pay off the interest on said bonds," and that the "interest to become due yearly" should be raised by taxation. This was not intended to fix a time at which the interest should be paid, whether quarterly, half yearly, or yearly. It was, therefore, within the power of the council to make the interest payable semi-annually.

14. The bonds of the city of Maysville were issued directly to the railroad company in payment of the city's subscription to the stock of the company, under the provisions of the statute. The stock constituted the consideration for the bonds. And, although the tax-payer, as he pays his taxes to meet the interest on the bonds, is entitled to stock *pro tanto* in the company, and to certificates thereof, as provided in the statute, still the fact that the company has become insolvent, and its franchises and property have been sold and its organization has been destroyed, cannot constitute a defense to a proceeding by innocent and *bona fide* holders of the bonds to enforce the collection and payment of the interest thereon.

15. Although the bonds, *supra*, may not be commercial paper in the sense of the law merchant, yet they are negotiable. And the statute which authorized their issue makes them negotiable paper which passes by indorsement or delivery, and is an important instrument of commerce. Where it bears on its face evidence of genuineness, and there is nothing to excite suspicion, the person who takes it *bona fide* in the course of business can enforce the payment of it, though it be not valid as between the original parties.

16. The acts of the General Assembly under which the bonds and coupons were issued by the city of Maysville to the Maysville and Lexington railroad company, are constitutional.

17. When the meaning of the constitution on a doubtful question has been once carefully considered and judicially decided, the instrument is to be received in that sense, and every reason is in favor of a steady adherence to the authoritative interpretation ; and especially so where the question is not simply as to the constitutionality of the law, but involves the validity of contracts, and the rights of innocent parties, and in which the law is only one of the elements.

F. T. HORD and CONWELL & COLLINS, for appellants, cited, *Tapping on Mandamus, chap. 3, page 74, Amer. ed., and notes; Ib.*
VOL. 2—8.

*pages* 32 *and* 85, *and notes ;* 5 *Texas Rep.*, 471 ; 2 *Watts & Serg.*, 416 ; 1 *Halst.*, 179 ; 18 *B. Mon.*, 426 ; *Ib.*, 852 ; *Tapping on Mandamus, pages* 60, 422, 460 ; *Bacon's Ab., tit. Mandamus, page* 520 ; *Morehead's Practice, page* 253, *and notes ;* 3 *Blackstone*, 113 ; *Angell & Ames on Corporations, pages* 817, 818 ; *Pierce on Amer. R. R. Law, page* 108, *and note ; Angell & Ames on Corporations, page* 275 ; 4 *McLean, C. C. R.;* pages 8, 387 ; 8 *Gill & Johns.*, 248 ; 1 *Maryland Ch'y Dec.*, 407, 442, 542 ; 24 *Conn.*, 159 ; 24 *Barb.*, 199 ; *Angell & Ames, pp.* 273, 274, 275, 276 ; 14 *Eng. L. & E. R.*, 57 ; 39 *Ib.*, 28 ; 11 *Humphreys*, 1 ; 13 *Peters*, 587 ; *Angell & Ames, pp.*, 268, 267, 327, 307, 291, *sec.* 270 ; *Ib., sec.* 256 ; *Ib., page* 284, *sec.* 265 ; 5 *Eng. L. & E. R.*, 503 ; 2 *Cranch*, 166 *to* 169 ; 3 *Bland Ch'y Rep.*, 606 ; 8 *Serg. & Rawle*, 521, 522 ; 2 *Cranch*, 127 ; 24 *Barb.*, 227, 228, 229, 230, 231 ; 13 *Barb.*, 570 ; 13 *B. Mon.*, 86 ; 1 *Payne's Rep.*, 400 ; 2 *Marsh.*, 101 ; 4 *B. Mon.;* 120 ; 5 *Barb.*, 649 ; 3 *Peters*, 407 ; *Pierce R. R. L.*, 371 ; *Commonwealth vs. Com'rs of Alleghany county, Amer. Law Reg., Dec.*, 1858 ; 3 *Casey Rep.*, 13 ; 8 *Barb.*, 233 ; 5 *Ib.*, 9 ; 13 *B. Mon.*, 84, 85, 87, 88 ; *Sess. Acts*, 1849–50, *pages* 304–5 ; 2 *Sess. Acts*, 1850–1, *page* 195 ; 9 *Dana*, 34, 296 ; 3 *Marsh.*, 25 ; 5 *Dana*, 138 ; 7 *B. Mon.*, 162, *et seq.*; 12 *Ohio Rep.*, 364 ; 5 *Denio*, 567 ; 3 *Barb.*, 223 ; 18 *B. Mon.*, 421 ; *Hardin*, 218 ; 3 *Marsh.*, 163 ; 3 *J. J. Mar.*, 548 ; 2 *Bibb*, 425 ; 5 *Mon.*, 120 ; *Rev. Stat.*, 193, *sec.* 6 ; *Constitution Ky., art.* 2, *sec.* 40 ; *Ib., art.* 2, *sec.* 36 ; 1 *J. J. Mar.*, 566.

T. C. Campbell, on same side, cited *Story on Contracts, sec.* 317 ; 5 *Barb.*, 613 ; *Angell & Ames on Corp., page* 101, *sec.* 111 ; 8 *Ohio Rep.*, 257 ; 3 *Ib.*, 553 ; 6 *B. Mon.*, 154 ; *Civil Code, sec.* 31 ; *Tapping on Mandamus, top page* 60, *side page* 23 , *Angell & Ames, sec.* 727 ; *Tapping, page* 278 ; *Ib., top page* 85 ; 5 *Texas*, 471 ; 2 *Watts & Serg.*, 416 ; 1 *Halst.*, 179 ; 18 *B. Mon.*, 848 ; 3 *Chitty's Blackstone, side pages* 111, 372 ; *Bacon's Ab. Title Mandamus ;* 24 *Mis.*, 439 ; 9 *Smedes & Mar.*, 77 ; *Story on Contracts, sec.* 667 *note ; Pr. Dec.*, 301 ; *Hardin*, 305 ; 5 *Mon.*, 507 ; 3 *Mar.*, 489 ; 3 *Mon.*, 80 ; 6 *Ib.*, 538 ; 2 *Cranch*, 4, 10, 23, 33, 52, 358, 386 ; 1 *Paine*, 400 ; 12 *Wheaton*, 64 ; 7 *Scott's N. R., page* 835 ; 17 *Ohio*, 340 ; *Angell & Ames, sec.* 291 ; 2 *Cranch*, 127 ; 6 *Wheaton*, 593 ; 2 *Marsh.*, 101 ; 11 *B. Mon.*, 143 ; 17 *B. Mon.*, 355 ; 1 *Marsh.*, 105 ; 4 *Bibb*, 17 ; 3 *Marsh.*, 2 ; 5 *Litt.*, 45 ; 7 *J. J. Mar.*,

84; 1 *Gallis*, 150; 1 *Paine*, 400; 13 *B. Mon.*, 285; 2 *Bibb*, 96;
1 *Ham.*, 10; 4 *Wash. C. C.*, 671; *Harper*, 101; 7 *Wend.*, 31; 3
*Ib.*, 482; 2 *Cowen*, 664, 667, 678; 7 *Ib.*, 462; 2 *Johns.*, 109; 5
*Barb.*, 613; 13 *Peters*, 587; 4 *Ib.*, 188–9; 14 *Ib.*, 122; 9 *Paige*,
476; 5 *Ib.*, 653, 654; 12 *Wheaton*, 68; 3 *Wend.*, 300; 9 *Ib.*, 392;
3 *Ib.*, 583; 7 *Ib.*, 34, 276; 20 *Ib.*, 392; 2 *Cranch*, 127; 3 *Barn.
& Ad.*, 10; 2 *Myl. & Craig*, 83; 14 *Eng. Ch. Rep.*, 87; 1 *Hop.
Rep.*, 26; 15 *Johns.*, 389; 3 *McLean*, 102; 4 *Ib.*, 8, 9, 10; *Angell
& Ames*, 6th *ed., secs.* 270, 277–299, 256; 1 *Md. Ch. Dec.*, 407
542; 5 *Denio*, 567; 7 *B. Mon.*, 132; 3 *McLean*, 102–3; 8 *Barb.*,
233, *et seq.*; 3 *Ib.*, 223; *Hardin*, 218; 3 *Marsh.*, 163; 3 *J. J.
Mar.*, 548; 2 *Bibb*, 425; 5 *Mon.*, 120.

WM. H. WADSWORTH, for appellees, cited *Civil Code, secs.* 523,
524, 526; 18 *B. Mon.*, 426; *Tapping on Mandamus, side page* 5;
11 *B. Mon.*, 145, 154; *Morehead & Brown*, 522; 18 *B. Mon.*,
848, 853; *Tap. on Mandamus, pp.*, 9, 10, 19, 171, 172, 189, 30,
51, 66, 67, 68, 121, 134, 210, 220, *margin; Ib.*, 29 *to* 281; *Ib.*,
*pages* 74, 325, 289, 314, 299, 404, 285, 286, 426, *margin; Angell
& Ames, secs.* 101, 234, 699, 712, 697, 698; *Morehead's Practice,
pp.* 252, 237; 9 *Md.*, 83; 12 *Barb.*, 220, 222; 3 *Bla. Com., p.* 110;
23 *Wend.*, 458; 2 *Hill*, 45; 28 *Miss.*, (6 *Cush.*,) 38; 8 *B. Mon.*,
648; *Opinion of Chief Justice Lowrie and Judge Woodward in
Commonwealth, ex relatione Thomas, vs. the Commissioners of Alle-
gheny county, Nov.* 11, 1858; 18 *B. Mon.*, 13; 16 *Johns.*, 65;
*amended charters Feb.* 17, 1851, *and Feb.* 4, 1854; *Opinion by
Justice Grier in McCoy vs. Washington co., Legal Intelligencer,
Dec.* 10, 1858; 1 *Mon.*, 175, 188; 17 *B. Mon.*, 48; 4 *Pet.*, 739;
10 *Curtis*, 348; 13 *B. Mon.*, 1; *original charter*, 1849–50, *sec.*
28; 1 *B. Mon.*, 14; 36 *Maine*, 78; 15 *Ill.*, 336; 21 *Penn.*, 131;
9 *B. Mon.*, 526; *Ib.*, 330; 2 *Ib.*, 176; *Withrow, &c., vs. L. &
N. Railroad Company, MS. Opin. Winter Term*, 1855; *Pierce
on Railroad Law, page* 115, *and notes* 2, 3, 4, 6, 7, 8, 9, 10, 11, 12;
*Ib., page* 122, *note* 1; *Zabriskie vs. Cleveland, Columbus, and
Cincinnati Railroad Company, opinion by Justice McLean.*

R. H. STANTON, on same side, cited *Tap. on Mandamus*, 289,
10, 12, 18, 19, 21, 24, 93; 26 *Barb.*, 250; 1 *Wend.*, 318; 13
*Barb.*, 443; *Civil Code, secs.* 30, 37; *Pettit vs. Perry, MS. Opin.,
January*, 1855; 15 *Barb.*, 375; *Thomas vs. Com'rs of Allegheny*

county, *Supreme Court Penn.*; *McCoy vs. County of Washington,*
*U. S. Dist. Ct. Penn.*, *per Justice Grier*; 17 *B. Mon.*, ——; 5 *East,*
470; 2 *Sand.*, 47; 17 *Barb.*, 468; 1 *Smith*, 273; 1 *Met.*, 410;
*amended charter, Feb.* 17, 1851, *Sess. Acts*, 1850–1, *page* 194;
*Parson's Mercantile Law*, 122; 8 *Paige*, 527; 1 *Smith*, 554; *Easton
vs. January, MS. Opin., June,* 1853; *Story on Promissory Notes,*
196; 1 *Adolp. & Ellis*, 498, 504; *Story on Bills*, 415; *Watts &
Serg.*, 445; *Civil Code, sec.* 526; 13 *B. Mon.*, 31, 33; 9 *Ib.*, 346;
*Ib.*, 526; 11 *Ib.*, 143; 1 *Ohio*, 95, 97, 105; 1 *Sneed*, 622, 627,
637; 21 *Penn.*, 169; 15 *Conn.*, 475; 8 *Leigh*, 120; 20 *Ohio*, 622;
9 *Humph.*, 252; 27 *Miss.*, 209, 224; 8 *La. An.*, 341; 6 *Florida,*
610; 13 *Ill.*, 516; *Pierce on Railroad Law,* 507; 21 *Ohio*, 77; 5
*Binney*, 87, 103; 1 *Serg. & Rawle*, 473; 2 *Binney*, 275; 16 *Serg.
& Rawle*, 317; 20 *Penn.*, 518; 4 *Casey*, 108; *Angell & Ames on
Corp., chap. Mandamus; Act of* 1813, *sec.* 2, 1 *Stat. Law*, 522;
*Civil Code, secs.* 523–527; *amended charter, Feb.* 4, 1854, *Sess.
Acts*, 299; 8 *B. Mon.*, 651; 13 *Ib.*, 151; 1 *T. R.*, 404; 2 *B. &
A.*, 646, 648; *Bacon's Ab., tit. Mandamus;* 8 *Mod.*, 28; 18 *B.
Mon.*, 12; *Clapp vs. County of Cedar,* 5 *Iowa Rep.*

H. TAYLOR, on same side.

JUDGE WOOD DELIVERED THE OPINION OF THE COURT:

By an act of the Legislature of Kentucky, approved 4th
March, 1850, the Maysville and Lexington railroad company
was chartered, with power to construct and maintain a railway,
commencing at any eligible point in or near the city of Mays-
ville, thence by the most practicable route to or near the city
of Lexington.

The 28th section of said act of incorporation conferred upon
the cities of Maysville and Lexington, and the counties of
Mason, Nicholas, Bourbon, and Fayette, and any other city,
county, or corporation, power and authority to hold stock in
the corporation created by the act, upon the same terms, on
the same conditions, and subject to the same restrictions with
other stockholders : provided the amount by said several cities,
counties, and corporations, separately subscribed, shall not, in
any single instance, exceed the following sums : by Maysville,
one hundred and fifty thousand dollars, etc. Said section con-
tains a further proviso in these words, namely : "That the city

council for the city of Maysville may, at any time after the passage of this act, on giving three weeks notice thereof in the newspapers printed in said city, cause a poll to be opened in the three wards of the city, and the sense of the voters taken as to the propriety of said city subscribing to the capital stock of said road, as provided in this charter; and if a majority of those voting are in favor, it shall be the duty of the board of council to subscribe the number of shares provided for in this charter, so soon as the books shall be opened."

In accordance with this proviso the city council of the city of Maysville caused the sense of the voters of said city to be " taken as to the propriety of said city subscribing to the capital stock of said road, as provided in this charter." The citizens of Maysville by their *unanimous* vote approved the subscription.

Subsequently, viz : on the 23d of April, 1850, the city council ordered a subscription to the capital stock of said company of one hundred and fifty thousand dollars. In obedience to this order the president of the council actually made the subscription in the books of the railroad company.

Availing themselves of the power conferred upon them by said charter, the counties of Mason, Bourbon, and Fayette, and the city of Lexington, also became subscribers to the capital stock of said company.

The legislature, by an act passed as an amendment to the charter of the company, approved 17th February, 1851, authorized " the county court of any county, and the city council of any city, who shall subscribe stock in said company, under the provisions of the original act, to execute bonds of the county or city, payable to the president and directors of said company, for the amounts severally subscribed by said counties and cities, payable at such times as may be deemed best by said county courts and city councils."

In said amendment it was further enacted, that " said courts and city councils respectively shall have power, and it shall be their duties severally, to levy and collect upon the real and personal property of said counties or cities an amount in money sufficient annually to pay off the interest on said bonds; which

interest shall be levied and collected as other taxes are collected in this State, and by the same collecting officer, under the same penalties," etc.

The bonds authorized by the first section of the amendment to be executed, were, by the same act, required to be made negotiable and transferable.

Under and by virtue of the authority conferred by this amendatory act, the city council of the city of Maysville, by appropriate and necessary steps and proceedings, executed one hundred and fifty bonds, each for one thousand dollars. These bonds were signed by the president of the city council, countersigned by the city clerk, with the seal of the city attached.

They were made payable to the Maysville and Lexington railroad company, assignee or bearer, were delivered to the company, and received in payment of the stock subscribed by the city.

Thus were these bonds executed and uttered by the city of Maysville, acting through its constituted authorities, with all the solemn and formal, as well as substantial, acts which were required by law, and usual and appropriate in such a case.

In addition to this, it is made apparent by the evidence in the record, " that at the time the one hundred and fifty bonds were made and executed by the city of Maysville, and delivered to the Maysville and Lexington railroad company in payment of its subscription, it was generally known amongst the people of the city that they were made for sale in the money markets of the country, and the said bonds were generally praised and commended by the people of the city as a safe and profitable investment; they were also praised and the sale encouraged by the newspapers of the city, and the sales of the bonds quoted and praised in said newspapers at the time." Extraordinary means were used to give currency and value in the money markets to these bonds. And it is only fair and legitimate to presume that the effect of these means, used by the city of Maysville and its citizens, was to induce the purchase of said bonds by innocent and *bona fide* purchasers, for a fair price. Neither before, nor at this time, nor for some time after, was a doubt or question raised as to the legality of all these proceedings, or the validity of the bonds.

In the language of the judge of the circuit court, in his most excellent opinion which has been sent up as part of the record, " under these circumstances, and after such conduct on the part of the city of Maysville, its authorities and citizens, the plaintiffs, now appellees, it seems, became in good faith and for a valuable consideration, the purchasers and holders of the bonds filed" in this record.

From the time the bonds were issued until July, 1857, the municipal authorities of Maysville regularly levied and collected taxes upon the real and personal property of the city, to an amount sufficient to pay all the interest upon the bonds. In fact, the entire interest which accrued prior to the day last named has been paid.

The tax required for the payment of the interest upon the debt which became due 1st July, 1857, was neither levied nor collected, and no fund having been otherwise provided, the interest coupons payable on that day were dishonored.

In this state of case, on the 26th of October, 1857, the appellees filed their petition in the Mason circuit court, as authorized and provided by title 10, chapter 13, of the Civil Code of Practice, praying the writ of mandamus, directed to the city council, commanding the levy and collection of the taxes, which were enjoined upon them by law.

After the filing of this petition a change occurred in the members constituting the board of the city council. The new board also failed to levy and collect the tax, as their predecessors had done. The interest coupons due 1st January, 1858, became due, and were left unpaid and were protested. Afterwards the appellees filed an amended petition, setting forth the facts which had occurred since the filing of their original petition. The members of the new as well as the old board were made defendants, and notice of the application for the mandamus, on the 3d day of the April term, 1858, was given.

Three of the defendants, who were members of the council of 1857, filed their joint answer to the petitions, in which they admitted the truth of all the material allegations, acknowledged the obligation, legal and moral, which rested upon the council to provide the means necessary for the payment of

the debt of the city, evidenced by her 150 bonds aforesaid, in the mode prescribed by the law under which the bonds were issued, admitted the delinquency of the council as a body, averred that they had always been ready and willing to perform the duty which the law had in their opinion enjoined upon the council.

On behalf of the other defendants, elaborate and very full answers were filed, in which the right of the appellees to the relief sought in their petitions was resisted upon numerous grounds, most, if not all of which, will be noticed hereafter.

Upon the hearing a peremptory mandamus was awarded to the applicants, commanding and requiring the board of councilmen of the city of Maysville, composed of Jonathan R. Paddock, Thaddeus C. Campbell, George W. Orr, James F. Willett, William H. McGranahan, Simon Nelson, Alexander Maddox, Franklin McClanahan, and William W. Lamar, to levy and collect, upon the real and personal property of the city of Maysville, an amount sufficient to pay the interest, aforesaid, which had accrued and remained unpaid.

From that judgment the appeal now before the court is prosecuted.

The grounds assumed by the appellants, upon which they ask a reversal of the judgment of the circuit court, may be most appropriately and conveniently considered in two general classes, namely:

1. Those which relate to and affect the remedy; and,

2. Those upon which the right of appellees to any relief whatever, no matter by what remedy it may be sought, is denied.

I. As to the remedy.

Under this head the ground mainly relied upon, and most earnestly urged in argument, by the counsel of appellants, is, " that the writ of *mandamus* is not the proper remedy to afford the relief to which the plaintiffs (appellees) are entitled, conceding that they are entitled to any relief," which, however, is not conceded by appellants in fact, but will for the present be assumed for the purposes of the argument.   It seems to us that the authorities upon this point are altogether conclusive.

Bacon lays it down thus: " If the party making the application has a right, a *legal* right, and no other *specific legal remedy, this* will not be denied." (*Bacon's Abridgment, vol.* 6, *tit. Mandamus, p.* 418, *et passim.*)

The remedy must be specific—" *a specific*"—a remedy adapted peculiarly and exactly to the accomplishment of the particular object desired. If there be no remedy like this, the writ of *mandamus* " will not be denied."

Blackstone says: " It issues in all cases where the party hath a right to have anything done, and hath no other specific means of compelling its performance." (*Black. Com., vol.* 3, *p.* 110 ; *Tapping on Mandamus, chap.* 3, *pp.* 9, 10.)

" It is a general rule that whenever an act of the legislature gives power to, or imposes an obligation on, a particular person to do some particular act or duty, and provides no specific legal remedy for non-performance, the court will, in order to prevent a failure of justice, grant the writ to command the doing of such act or duty." (*Commonwealth of Penn., ex rel. Thomas, vs. the Commissioners of Allegheny county, reported in the American Law Register for December,* 1858 ; *Tapping on Mandamus, mar. p.* 30.)

In Angell & Ames, after a statement of many particular cases in which mandamus lies, it is said, " the writ of mandamus lies, too, to compel a corporation or its officers to do many other acts which, by general law or by virtue of official station, they are bound to do, which the party prosecuting the writ has a right to have done, and for which there is no other adequate, specific, legal remedy." (*Angell & Ames on Corporations, sec.* 707.)

Now let us apply these principles to the case before the court. The appellees were the holders of the bonds of the city of Maysville, the interest upon which they were entitled to receive semi-annually, at the rate of six per centum per annum.

The statute which authorized the execution, issue, and circulation of those bonds, prescribed the mode in which the money necessary for payment of this interest was to be raised. It imposed upon certain functionaries of the city the obligation and duty of raising this money. The city council was " *author-*

Maddox et al. vs. Graham & Knox.

*ized* and *required* to levy and collect, upon the real and personal property of the city, an amount in money sufficient annually to pay off the interest on said bonds."

Here was a right, a legal right vested in the appellees, who were holders of the bonds. They had a right to receive the interest, and they had a right to have the tax levied and collected for its payment.

What other specific legal remedy had they for the enforcement of this clear and undoubted right? Had they a *specific* for the evil of which they complained? Had they a remedy adapted peculiarly and exactly to the accomplishment of the particular object desired?

These interrogatories can receive none but a negative answer. There was no other mode in which these delinquent officers of the city could be compelled to perform the duties enjoined upon them by law. To exclude the use of the mandamus, because there is another remedy, it must be one against the same parties. (*Tapping, side page* 19.)

How, otherwise than by this remedial writ, could the appellants have been coerced to the performance of their official duty? It was not a judgment in their favor against the city for the amount of the unpaid interest that the appellees asked in their petition. They asked that public officers—the city council of Maysville—authorized and required by law to levy and collect, as taxes, an amount in money sufficient to pay the interest upon the railroad bonds of the city, should be compelled to perform this duty.

We have had occasion before to observe that the supreme law-making power of the State had given power to, and imposed an obligation on, the city council to do a particular act or acts; that, by the statute, no specific legal remedy had been provided for non-performance. Certainly, according to our authority above quoted, the court will, in order to prevent a failure of justice, grant the writ to command the doing of the act or acts enjoined by the statute.

In all of their essential and distinguishing features the case of the *Justices of Clarke vs. the Paris, Winchester, and Kentucky River turnpike road company,* (11 *B. Mon.,* 143,) and the case

at bar, very closely resemble each other. We allude to the features necessary to be considered in determining the remedy.

In the former, it was decided by this court (11 *B. Mon., p.* 154) that mandamus was the appropriate, and indeed only, remedy for compelling a county court to comply with its duty and obligation to levy money to pay their subscription to the stock of a turnpike road company.

In *Page, Second Auditor, vs. Ben. Hardin,* (8 *B. Mon.,* 648,) the powers and duties of the circuit courts in reference to writs of *mandamus* are very clearly stated. The reasoning of the opinion in that case, and the authorities therein cited, show this to be an appropriate case for a *mandamus.*

II. But it is insisted that the proper parties were not before the court on the motion. It is said that the railroad company was a necessary party. We do not perceive that the company had any interest in this particular controversy. Certainly, in order to a complete and satisfactory disposition of the application for a *mandamus,* it was not necessary that the company be a party.

Nor was it necessary that the tax-payers of the city should be made parties. It was not proposed by this proceeding to operate upon them, but upon the city council only; and the council alone had the right to be heard in opposition to the application.

It was not necessary that the other holders of the railroad bonds should be parties, because their interest could be as well represented by the applicants for the writ as if they were themselves parties.

The Allegheny bond case is an authority for awarding the writ upon the application of one bond-holder—he holding two bonds of an issue of three hundred.

There was no need that the proceeding should have been in the name of the Commonwealth. This is shown conclusively by the *Civil Code, sec.* 526 : "The writ * * * is granted on the motion of the party aggrieved, or of the Commonwealth when the public interest is affected." The applicants in this case were certainly "parties aggrieved," and the writ might well be granted on their application or motion. It is not a

case in which it is required that the Commonwealth be a party. Generally, if not universally, in Kentucky, applicants for the aid of this writ have made motions in their own names. (See all the reported cases.)

III. It is urged with much earnestness, in argument for appellants, that it was erroneous in the circuit court to grant the writ, because actions had been brought by the appellees against the city of Maysville, upon the coupons which were due and unpaid. To this it seems only necessary to say, by way of answer, in addition to what has already been said of the difference in the remedies, that when the writ of mandamus was awarded, the actions at law upon the coupons were not pending. They were dismissed on the 10th day of April, and the judgment upon the motion for a mandamus was not rendered until the 29th April, 1858. So that if these actions ever did stand in the way of relief upon the motion, they were removed before action by the court upon the motion. There was no *lis pendens* at the time the writ was awarded. Upon this point see *Tapping, side page* 23.

IIII. This brings us to consider another question which is argued at length by the counsel of appellants, namely : Did the court err " in hearing evidence to controvert the statements of facts in the defendants' answer or return ?"

In the commencement of their argument upon this point, it seems to us that counsel have committed a capital error, in assuming that the common law in reference to mandamus is yet in force in Kentucky without change. Assuming this to be so, it is now contended that the circuit court could not try the truth of the matters stated in the answer; but if a cause legally sufficient were stated in the answer, it must be assumed by the court to be true, and decline to proceed further on the mandamus. The cases of *Goheen vs. Myers*, (18 *B. Mon.*, 426,) and *County Court of Anderson vs. Stone & Son*, (*Ibid*, 852,) are relied upon to sustain this view.

These cases seem to have been totally misconceived.

That the court entertained a different opinion is manifest from this sentence in the opinion in *County Court of Anderson vs. Stone*. This language is used by the court : " Consequently

the jurisdiction of the circuit court to hear the application and award the writ, if it were authorized by the testimony, was unquestionable." ·

"If it were authorized by the testimony." Undeniably this implies that the court had the right to hear the testimony, and decide thereupon the facts of the case. Afterwards the effect of the testimony and the result of the trial are stated by the court. It is stated, as proved, that the bridge, as built, is not worth as much as has been paid to the plaintiffs for the building of it; that it is essentially defective, etc., etc. And then follows the court's conclusion: Under these circumstances, *i. e.* in view of the proof of the facts as the court upon trial has found them to exist, the plaintiffs' motion should have been dismissed, unless the defendants have done some act by which they are precluded from relying upon this defense. The tenor and effect of the entire opinion goes to show that the court did not entertain the opinion imputed by the counsel of appellants.

In *Goheen vs. Myers* there is nothing inconsistent with the interpretation we here give to the opinion in the *County Court of Anderson vs. Stone & Son.*

Whether the statute 9 *Anne* was ever in force in this country or not, it is not necessary now to decide. If not before, the common law was certainly changed by our statute approved January 8, 1813. (*Litt.*, 5 *vol.*, 11, *and M. & B. Statutes, vol.* 1, *p.* 522.) The second section of that act makes it lawful for the person, at whose instance a mandamus has been or may be thereafter issued in any case, to traverse the truth of the whole, or any one or more of the facts asserted in the return made to the writ, etc. A trial by jury was then provided for. And by the 3d section of the act it was made the duty of the court entertaining jurisdiction, as before stated in the act, upon the result of the finding by the jury, to pronounce judgment thereon in favor of either party, according to law.

There can be no mistaking the effect of this enactment. It was not repealed by the Revised Statutes, being within the exceptions from the repealing clause.

So far as it is inconsistent with, or within the purview of, the provisions of the Code of Practice upon the same subject,

it was repealed by the adoption of the Code. But the *Code of Practice* (*chap.* 13 *of title* 10) contains in substance the same provisions as the act of 1813. The court shall hear and decide all questions of law or fact arising in the motion, and the granting or refusing the writ shall be the final order in the motion. (*Sec.* 524, *C. P.*)

Undoubtedly the legislature intended that the answer should be traversable, and that the court should have the power to hear evidence controverting and supporting the statements of the answer, and then to decide all questions of law and fact arising in the motion.

The writ of mandamus is not now, as formerly, a high prerogative writ, emanating from the grace or favor of any one; but is a statutory writ or order of a court of competent jurisdiction, and, in a proper case, is to be granted on the motion of any party aggrieved.

There is no error upon this point.

V. It is said there never has been any actual refusal to levy the tax, consequently no motion for a *mandamus* can be entertained.

It was the duty of the council to have levied the tax. They failed and neglected to levy it, and the coupons for the interest due 1 July, 1857, and 1 January, 1858, were left unpaid and allowed to be dishonored.

In this certainly there was violation of duty and neglect of obligation.

But this was not all. An ordinance providing for the collection of the tax had been passed by the board. Subsequently this ordinance was repealed, notwithstanding the strong opposition of a minority of the board.

The proof shows that the council was then appealed to by memorial to levy the tax. They declined to do so, and it was said to the person who presented the memorial that there was no probability that they would levy the tax. They were repeatedly urged to the levy, but with no effect.

It has been held that the rescinding of an original resolution on which a dispatch was framed, is equivalent to an absolute refusal to transmit such dispatch, and sufficient to authorize

the court to entertain the subject-matter of the mandamus. (*King vs. East India Company*, 4 *Barn. & Ad.*, 535.) This is approved by *Tapping*, *side p.* 286. So, if it be clear from the acts of the defendant that he does not intend to comply with the demand, a statement of the facts upon which such supposition of the prosecutor is based, will be considered by the court as tantamount to a refusal. An express and explicit refusal, in terms, is not necessary to put the party in fault. It will be sufficient that his conduct makes it apparent that he does not intend to do the act required.

The pleadings and proof make it quite clear that the council had no intention to levy the tax; indeed, that they were resolved not to do so. In their answer in this case, appellants avow that they are resisting the payment of this railroad debt; and say that, in doing so, they " are acting in obedience to a solemn conviction of public duty."

In the face of the record, it seems to the court almost frivolous to say, " there had never been any actual refusal to levy the tax."

VI. We do not esteem it a valid objection to the judgment of the circuit court that the terms of office of the board of 1857 had expired, and that a new board, composed in part of different members, had been formed.

Virtually, this is a proceeding against the corporation, and the judgment is obligatory on the members of the board of councilmen in office at the time of its rendition. It may assume the character of an individual proceeding, if it becomes necessary to enforce the orders of the circuit court, by attachment or other process, for contempt. But a change in the membership of the board does not so change the parties as to abate the proceeding. The constituent parts of the board may not be the same, but the representative body remains identical. (*City of Louisville vs. Kean, &c.*, 18 *B. Mon.*, 13.)

VII. In regard to the ownership of the bonds and coupons, we deem it sufficient that it was alleged positively by the petitioners that they were the owners of the bonds and coupons; the plea intended to put it in question is " uncertain and equivocal," and the bonds and coupons were produced on the trial by the petitioners.

*Second.* Having disposed of the various objections taken by appellants to the *remedy*, of which the appellees seek to avail themselves, and to the time and mode of its invocation, we come now to consider the grounds which go more peculiarly to the merits of the case ; which touch the very cause of action or complaint, and upon which appellants deny that appellees have any rights at all, to be redressed by any remedy whatever.

The first of these grounds presented in argument is, that the subscription of the city of Maysville, of one hundred and fifty thousand dollars to the capital stock of the Maysville and Lexington railroad company, *is void.*

In support of this position, it is argued (1) that the city of Maysville had no power to make this subscription, previously to the enactment of the Maysville and Lexington railroad charter. We take it to be quite certain that this proposition is true, and that no one will controvert it.

And (2) we admit, in all of its force, the familiar doctrine that a corporation, being the mere creature of law, possesses only those properties and powers which the charter of its creation, or some amendment or addition thereto, confers upon it, either expressly or as incidental to its existence and legitimate action. And where a corporation is directed or allowed to do any act, and the mode in which the act is to be done is prescribed, that the mode so prescribed must substantially and in good faith be pursued.

" The act of incorporation is *an enabling* act; it gives to the body corporate all the power it possesses," etc., etc. (*Angell & Ames, 323.*) With the directions of such acts there must be a compliance substantial and *bona fide.*

And further, that "persons dealing with the managers of a corporation must take notice of the limitations imposed upon their authority by the act of incorporation." (*Pearce vs. Mad. and Indianapolis and the Peru and Ind. railroad companies, in the supreme court of the United States, September,* 1858, *reported in the American Law Register for May,* 1859.) [21 *Howard,* 443.]

If, in an act of incorporation, a specified act is directed to be done by a particular *agent,* it must be done by *that* agent.

" In construing an act to establish a private corporation, it is a rule of law, that it must be construed strictly, as against the corporation, but liberally in favor of the public."

These are admitted principles about which there can be no controversy, except, possibly, as to their application.

But it is quite certain that the statutes (cited *supra*) gave to the corporation of the city of Maysville the power to hold stock in the Maysville and Lexington railroad company; to become indebted to the company for the stock which might be subscribed, and to execute the bonds of the city for the amount of the stock.

The question as to the power of the cities and counties authorized to hold stock in said railroad company and to issue bonds, was fully considered by this court in the case of *Slack and others vs. Maysville and Lexington railroad company*, (13 *B. Mon.*, 1.) In that case it was decided that the amendatory act of 17 February, 1851, applied to the subscription of the Mason county court which had been made prior to the passage of the act; and that, without the amendatory act, the court might, under the authority of the original act of 1850, " have issued the bonds of the county in some form," which bonds, with the assent of the company, could at once have been transferred to them in payment of the subscription of the county for stock.

This is virtually and to all intents a decision as to the powers of the city of Maysville under the two statutes, because the city and county stood in precisely the same attitude.

In this connection it is appropriate further to remark that the bonds issued by the county of Mason and the city of Maysville, were exactly similar in form and substance — in tenor and effect. And the various questions now made in reference to the city bonds, were then made in reference to the county bonds, and were considered and decided.

For very many and very sound and potential reasons, not necessary here to be enumerated, this court now recognizes the duty incumbent upon them of respecting and following that decision.

The laws of our Commonwealth are not altered with every change of those who are chosen by the citizens to administer them. Nor are they affected by the mutations of public sentiment in regard to measures for public improvement, or any other measures, or the acts of individuals concerning those measures, except so far as those mutations of public opinion are manifested in the form of legislation.

The city possessing the power then, as we have seen, to execute her bonds for the payment of her subscription to the railroad company, and having executed the power, has she done so in the mode pointed out by the statutes by which the power was conferred?

1. It is said that the subscription to the stock of the company, made on behalf of the city, was *void*, because it should have been made by the mayor of Maysville. That the mayor was the *agent* appointed by the statute to perform the act of subscription, and the act not having been performed by the agent designated by the statute, it was and is void; and the city was not bound to pay the subscription.

This point is settled by the 28th section of the act chartering the railroad company.

By the first proviso of that section, (there being four distinct and separate provisos therein,) after the result of the popular vote directed to be taken upon the propriety of the subscription is ascertained, it is made the duty of the mayor and council of every city, wherein a majority of all the qualified voters have cast their votes in favor of the subscription, to pass an ordinance directing the mayor, on behalf of such city, to subscribe, etc. This proviso is general, and relates to all cities and counties embraced in the act.

The fourth proviso is very different. It is special, and relates to the city of Maysville alone. By this proviso the city council for the city of Maysville is authorized and directed to cause a poll to be opened to take the sense of the voters as to the propriety of the subscription proposed by the city, etc. And the proviso in conclusion enacts, "if a majority of those voting are in favor, it shall be the duty of the board of council to subscribe the number of shares provided for in this charter

so soon as the books shall be opened." Is it possible that language can be plainer or more unequivocal than this?

The board of council is unmistakably appointed the "*agent*" to make the subscription.

It seems to the court hardly to need an argument to prove that the act of subscription was performed by the agent really appointed by the statute. But if it did, and we apply the identical rules of construction laid down by the counsel of appellants in construing this statute, it appears to be impossible to arrive at any other conclusion than the one to which the circuit court came.

The first rule relied upon is this: Every statute must be so construed as to give effect to the intention of the legislature, if that intention is apparent, or can be ascertained from the statute itself.

The intention of the legislature in enacting the last proviso is now the particular object of inquiry. To ascertain that we look first to the proviso itself. Looking to that, there would seem to be no room for doubt as to what the intention was. The language employed is so brief, so plain, so totally free from ambiguity, there seems no pretext for hesitation or uncertainty as to the intention of the legislature expressed therein. If any other meaning is to be attributed to it than that which the language plainly imports, it devolves upon those who insist upon the different interpretation to prove conclusively that the legislature meant something else, and to show what they did mean. This appellants have failed to do.

It is not doubted by any one that this proviso confers power upon the council to give notice of and hold the election previously provided for. Is the grant of power to make the subscription less explicit, or any more to be doubted? Indeed, the language is in its nature imperative. It imports a command to the board of council.

Are appellants at liberty to deny that in this proviso the council alone was authorized to subscribe, when previously the authority was to the mayor and council, simply because they cannot find a reason for the change satisfactory to themselves?

The intention of the legislature is palpable on the very face of the act. It needs no process of reasoning to eliminate it.

And wherein the last proviso is repugnant to the first, the last must prevail.

Tested by the second rule laid down by the counsel of appellants, their construction is not more tenable.

The rule, as laid down by Blackstone, is, that "one part of a statute must be so construed by another that the whole may (if possible) stand : *ut res magis valeat, quam pereat.*" (1 *Black. Com., mar. p.* 89.)

Now, by the construction contended for on behalf of appellants, one part of the statute, exceedingly important and significant, is completely destroyed. A distinct and substantive portion of the last proviso of the 28th section is annulled by a former provision.

We understand the rule to be, that when two parts of the same statute are irreconcilably opposed to each other, the last in order of time, being the most recent expression of the will of the legislature, is to be held the law in preference to the first. But the argument of appellants' counsel reverses this rule. They say there is such an opposition between the two parts, but the last must give place to the first; and that, too, when the last is quite as positive and unequivocal in terms, and distinct and clear in its meaning, as the first. Surely this is not to be allowed.

The construction of the circuit court is far more natural, does less violence to the statute as it stands, and complies more strictly with the rule.

The first proviso relates to counties and other cities than Maysville. The last concerns the city of Maysville only.

The construction of the circuit court allows the entire statute to remain intact, except so much of the first proviso of the 28th section as relates to Maysville. What is enacted concerning the several counties and county courts, and the city of Lexington and its mayor and council, remains unchanged. Not a word of it is lost or destroyed.

But the legislature, for reasons no doubt perfectly satisfactory to the members, by the last proviso, modified so much of the first as related to Maysville. The city council was authorized to perform certain acts, which, according to the first pro-

viso, might have been performed, and indeed should have been performed, some by the railroad company and others by the mayor and council of the city. In enacting this proviso, the legislature had in its mind but a single corporation, namely : the city of Maysville.

It cannot be doubted that there was entertained a well defined purpose as to the powers and duties of this corporation; and that this purpose is fairly expressed in the language which the legislature has employed. We do not feel at liberty to decide that it was the purpose of that body to do either more or less than its language in this proviso plainly shows to have been done.

The court does not perceive any good reason why the board of council could not just as well have made the subscription as the mayor and council. It was purely a *ministerial* act. It was but carrying into execution the judgment and determination of the qualified voters of the city, expressed with perfect unanimity at the polls. The act makes it the duty of the board of council to subscribe, etc., " *if a majority of those voting are in favor* " *of the subscription*. And it mattered little *who* actually signed the obligation, in behalf of the city, in the book of the railroad company, or whether there was such signature at all. The substantial and significant acts had been performed before. (*Justices of Clarke vs. P., W., and Ky. R. T. R. Co., supra.* See, also, upon this point, and others involved in this case, the opinion of Justice Grier, in the case of *McCoy vs. Washington county*, tried in the circuit court of the United States for the western district of Pennsylvania, reported in the Legal Intelligencer for December, 1858.) At all events, this was manifestly the opinion of the legislature. And acting upon that opinion, they have enacted a statute which is not to be evaded by far-fetched reasoning or forced construction.

So far, therefore, as the conclusion, that the bonds and coupons are void, is attempted to be drawn from the assumed fact that the subscription of the city to the stock of the company was unauthorized and void, made as it was, there is a complete failure ; because the premise is not established. The subscription was *not void*, but valid and obligatory.

Again : it is contended by the appellants that the bonds and coupons which were issued by the council were different, not only in form, but in their spirit and effect from the bonds which were authorized by the act of the General Assembly, and which alone the counties and cities were authorized to execute, and are therefore void, vesting no right in the holder, and imposing no obligation upon the corporation.

The first specification under this general head is this, that the bonds are made payable to *" the Maysville and Lexington railroad company,"* whereas, the amended charter provides that they shall be made payable to the *president and directors of said company.* And numerous authorities are cited to show that when a corporation relies upon a grant of power from the legislature, for authority to do an act, it is restricted to the mode prescribed by the statute for its exercise.

This seems to us to be an objection of the merest form. There is really and in fact, no departure from the substance and essence of the mode prescribed by the statute.

What conceivable difference can there be between bonds made payable to the " company," and bonds payable to the " president and directors" of the same company ? In either case they are the property of the company, and no more in one case than the other. They will not be more injurious or burdensome to the city in one case than the other.

Certainly it could not have been the intention of the legislature to have the bonds made payable to *" the president and directors of the company,"* so as to invest them, *as individuals,* with the right to the bonds. Obviously and undeniably the purpose was to make the bonds the property of the corporation —the railroad company. This object has been effectually accomplished, and *in* a mode not essentially different from the one prescribed by the statute.

In *Pendleton, &c., vs. the Bank of Kentucky,* (1 *Mon.,* 175,) it was decided by this court that a bond payable to " the president and directors of the Bank of Kentucky" is a bond payable to the corporation, notwithstanding the corporate name of the institution was " the president, directors and company of the Bank of Kentucky." We apprehend the decision would have

been the same if the bond had been payable to "the Bank of Kentucky."

Would it not be, in the language of Judge Mills in the case just cited, repugnant to the principles of justice to permit parties contracting with corporations to avoid their contracts, and corporations to avoid their own grants, for small errors and omissions in stating the corporate name?

The error in this case, if there is one, is not the error of the corporation or party to which the bonds were executed, but of the corporation or party which made the bonds.

This case, although it may not be in terms exactly like the case of *Pendleton vs. the Bank of Kentucky*, is within the principle and spirit of that case. There is no variance in the mode which will authorize the court to decide that the bonds are void. Such a decision would be "repugnant to the principles of justice."

The second objection specified under this head, that the bonds were made payable upon their face to the company and its "*assignee or bearer*," is not more tenable. The act of the 17th February, 1851, directs that the bonds authorized thereby, shall be negotiable and transferable by the order of the president and directors of said company.

The company might by its indorsement have made them payable to bearer. This no one will question. If such an indorsement could well be made by the company, we see no reasonable objection to the city, by agreement with the company, making the bonds on their face payable to the assignee of the company, or the bearer of the bond.

Sale in the money markets of this or foreign countries was the very purpose for which the bonds were made. This purpose was known to the makers of the law by which they were authorized. The more certainly to accomplish this purpose, it was provided that the bonds were to be made negotiable and transferable. As many as possible of the elements of circulation were to be imparted to them.

It seems to us that no more was done than the law authorized to be done. The law required the bonds to be made "negotiable." By being made payable to "bearer," they were

made "negotiable" by delivery. (McCoy vs. Washington co., supra.) In obedience to the express letter of the law, they were made transferable by assignment or delivery. All this is in accordance, not only with the law under which the bonds were issued, but with the well known usage of the country in reference to such instruments. The bonds, we are authorized to presume, derived an additional value from their peculiar form. Maysville, so far from being injured, must have been benefited thereby.

The third specification under this head is two-fold. 1. That the bonds and coupons were made payable in New York. 2. That the interest was made payable semi-annually.

Upon this specification we may remark, first, that it is not perceived how the law has been violated in either of the points. It is no where, and in no language, enacted that the bonds or coupons shall be made payable at Maysville, or any other point. No place of payment is fixed by any of the statutes. Upon this point they are silent. Evidently it was the intention of the legislature to leave the place at which the bonds and coupons should be made payable to the uncontrolled discretion of the makers of the bonds. This being true, the functionaries of Maysville had as complete authority to make New York the place of payment as Maysville, or any other point.

We do not think there is any warrant for the conclusion that the city and county authorities were allowed no discretion as to the place of payment, merely because it is said that the bonds may be made payable at such times as may be deemed best by said county courts and city councils. The expression of discretion upon one point does not exclude all idea of discretion upon every other point.

It must be presumed that the members of the legislature had knowledge of the mode in which these bonds were usually made. It is a well known fact that all such securities, and the coupons for the interest upon them, are made payable almost, if not quite, universally in our great commercial metropolis. And they are so made because the bonds are sold more readily and for much better prices than if payable at one of our far interior towns or cities, or if no place of payment is fixed.

They have a higher and far more certain commercial value by reason of the fact that principal and interest are payable at such a pòint as New York. This being known to the members of the legislature, it is not to be presumed that they deemed it necessary to say anything about discretion upon this point in the act.

But time of payment was not so well fixed by custom. *Time* would more likely be a matter for negotiation between buyer and seller of the bonds than *place* of payment. One capitalist would prefer them payable at long time, another at a shorter time, and the value and vendibility of the bonds would be liable to variation according to the peculiar and different views of different buyers. There was, therefore, an obvious propriety in giving in express terms a discretion as to the *time* of payment. Suppose the act had been silent upon this point. Would it have been doubted that the county courts and city councils had the authority to use their own discretion as to the times when the bonds should be payable ? We presume not. And if not, is there more reason to deny that they had the right to use their discretion as to the *place* of payment when the right was not expressly given in the statute ?

In regard to the second portion of this specification, we think it quite as clear that the statute, when properly understood, does not require that the interest upon the bonds shall be made payable *yearly*, and not otherwise.

It is true that the first section of the act of 1851 provides that it shall be the duty of the county courts and city councils " severally to levy and collect * * * * * an amount in money sufficient annually to pay off the interest on said bonds." This means only that in each and every year an amount sufficient to pay all the interest which will accrue during the year shall be levied and collected. The second section provides that the " interest to become due yearly " shall be raised by taxation. Evidently this provision is the equivalent of that just quoted from the first section. In neither of them was it the purpose of the legislature to fix a time at which the interest on the bonds was to be paid, whether quarterly, half yearly, or yearly. To regulate the exact and particular times at which

the interest on the bonds was to become due and payable was
not within their thoughts. The object intended to be accom-
plished by these provisions was, that the interest which would
accrue in each and every year, whether annually or semi-annu-
ally, it did not matter, should be met by a tax levied and col-
lected within the year upon the real and personal property of
the city—to provide surely that the accruing interest should be
paid by taxation, and to fix the mode of levying and collecting
the tax.

One of the rules of construction relied upon in argument by
the counsel of appellants may be here referred to as peculiarly
pertinent. The rule is this: An act to establish a private cor-
poration must be construed strictly as against the corporation,
but liberally in favor of the public. The argument for appel-
lants reverses this rule. Their mode of construction is strict
against the public and liberal in favor of the corporation. It
must be remembered that this is a contest between the corpora-
tion, represented by its officers on the one side, and the public,
represented by the bond-holders on the other.

It is further to be observed that all of these questions which
relate to the form of the bonds—to whom payable, where pay-
able, etc., are settled by the case of *Slack and others vs. the
Maysville and Lexington railroad company, supra.* In that case
there arose questions in regard to the Mason county bonds pre-
cisely similar to those now presented. They were decided in
favor of the legality of the acts of the Mason county court and
of the validity of the county bonds. The decision of those
questions must now be held decisive of the questions made
here, precisely similar.

But it is urged that the city council should not be required to
levy and collect a tax from the tax-payers of Maysville to pay
the interest on the bonds or the coupons held by appellees, be-
cause the consideration, which was secured by the charter to
the tax-payer as an equivalent for the sums so paid by him
for that purpose, has failed.

No failure of consideration is made to appear which consti-
tutes a sufficient defense to this proceeding.

The appellees produced upon the trial the bonds of which
they claim to be the holders, with the coupons attached. Their

execution is not denied, but admitted; and that they were delivered to the railroad company in payment for the stock subscribed by the city, and to be used by the company to raise money for the construction of the road.

We have decided that the city council had the power to bind the city, and did bind the city for the payment of the principal, and, of course, the interest of these bonds.

The obligation to pay the interest would be found in the bonds themselves, without the coupons. But they are appended to the bonds as the appointed evidence, agreed upon by the parties, to show who is entitled, as holder of the bond, to receive the interest due at a particular date. They are a modern invention, intended for the convenience of the payers of the bonds, and of the persons who may be the holders. They are evidence of debt in the hands of the holder, and proof of payment in the hands of the debtor. They are made payable to bearer, and were attached to the bonds to facilitate their negotiation, and thereby add to their value. They pass by delivery; and by the contract of the parties, and the well established usage of the country, are sufficient evidence of a debt to the holder as against the obligors in the bonds. (*McCoy vs. Washington county, supra.*) They have the same consideration to support them that the bonds have.

Appellants seem to suppose that the certificates of stock which tax-payers were to receive, as provided for by the charter, constituted the consideration of the bonds; that these were the equivalents to be received by the tax-payers for the sums paid for interest on the bonds. This is a mistake. The corporation of Maysville subscribed for a certain number of shares of the capital stock of the company. For this stock the city was bound to pay. Under the express authority of the act of 17th February, 1851, the bonds of the city were issued directly to the company, in payment of the subscription to the stock of the company. When so received, the city became entitled to her stock. (*Slack, &c., vs. M. & L. R. R. Co., supra.*) And this stock constituted the consideration for the bonds. As the tax-payer pays his taxes to meet the interest on the bonds, he is entitled to stock *pro tanto*, and to his certificates as provided in the charter.

That the railroad enterprise has failed—that the stock has lost all value—that the company has become insolvent, and its franchises and property have been sold—that the corporation is defunct, and no longer maintains an organization through which to issue certificates of stock to tax-payers, when entitled to them—these may all be facts; and yet not facts which would constitute a good defense to an action upon one of the city bonds, or upon a coupon. Nor do they constitute a defense upon which appellants can or ought, either legally or morally, to resist the relief sought against them.

It has been expressly decided by the supreme court of Iowa, that "the purchaser of a county bond, issued in payment of subscriptions to the capital stock of a railway corporation, has nothing to do with the fact that the company, since the issuing of the bond, has become insolvent, or may have been dissolved. (*Clapp vs. The county of Cedar, Western Law Monthly for January.*) [5 *Clarke, Iowa Rep.*, 15.] In that case other points, similar to some raised in the case now before the court, are ruled as they have been here.

That the citizens of Maysville miscalculated as to the ability of the railroad company to achieve this darling enterprise of theirs—that they themselves have acted hastily, without prudent forethought and discretion, and made a bad bargain—that the money for which the bonds were sold was squandered by the company, and is a total loss—are no answer to the innocent and *bona fide* bond-holder who has parted with his money for them, when he demands payment of either principal or interest of the bonds.

The city owes the debt, and is bound alike in law and good morals to pay it, with the interest as that accrues. It is an imperative duty, devolved by law upon these appellants, to provide in the prescribed mode for the prompt payment of this interest. It is no less a duty to the performance of which they should feel impelled by every dictate of morality and honor—a duty to themselves, a duty to the city and citizens of the city whose officers they are, a duty to the holders of the bonds, and a high duty to the public, which is vitally interested in its prompt and faithful discharge. It is, moreover, a duty from

the performance of which they cannot escape, so long as the courts of our State remain true to the law, and resolute and firm in the discharge of their duties.

We will not enlarge upon the moral view of the case, which has been so justly and aptly treated by the circuit judge—himself a citizen of Maysville. He has manifested a thorough and earnest, as well as accurate, appreciation of the subject. We now dispose of it with the expression of our hearty and unqualified approval of every word contained in his opinion upon that view of the case.

There is but one other ground assumed by appellants which we esteem it necessary or proper to notice in this opinion.

They "contend that the act (of the legislature) under which the bonds and coupons were issued is unconstitutional and void, and all contracts entered into by the city of Maysville, or the Maysville and Lexington railroad company, under and in pursuance of that act, are also *null* and *void*."

We cannot esteem it otherwise than as an imperative duty to dispose of the constitutional question thus raised in very brief terms. In this court it is not now a question open for argument. It is one which has been formerly before the court, was thoroughly argued, maturely considered, and was solemnly and authoritatively decided. It was not *a similar question* arising in a case somewhat analogous to this, but it was *identically the same question*—the constitutionality of the very laws now brought to the consideration of the court.

In the case of *Slack and others vs. the Maysville and Lexington railroad company (supra)* these laws were decided not to be unconstitutional, notwithstanding the able and elaborate dissenting opinion of a distinguished member of the court.

In the language of the supreme court of Pennsylvania, in the case of *The Commonwealth by Thomas vs. The Commissioners of Allegheny county,* we say "the question should be considered at rest. We cannot agree with counsel, that, because it is a constitutional question, it should be treated as always open. Where the meaning of the constitution on a doubtful question has been once carefully considered and judicially decided, the instrument is to be received in that sense, and every reason is

in favor of a steady adherence to the authoritative interpretation."

In the supreme court of Pennsylvania, when the case of *Sharpless vs. The City of Philadelphia,* which involved a constitutional question like this, was before that court, two judges dissented from the opinion of the court, which was in favor of the constitutionality of the law. And yet, when a similar question was presented to that court in the case of *Commonweulth vs. Commissioners of Allegheny county,* the court felt bound by the decision in the *Sharpless case.*

And in *this* case there are even stronger reasons than any which existed in *that* " in favor of a steady adherence (by this court) to the authoritative interpretation" of the constitution given in the *Slack case.* As said by Judge Lowrie in the Allegheny bond case, " we have before us now quite another question. In the *Slack case* it was simply a question of the constitutionality of the law. Now it is a question of the validity of contracts, in which the law is only one of the elements."

When the Slack case was decided these bonds had not been sold. Now they are in the hands of innocent holders, who have received them *bona fide,* and have parted with value to obtain them. And, without doubt, we are authorized to assume that appellees and others have bought these bonds upon the faith of that decision.

If this court were now to overrule its former decision, it would be an inconsistency as gross in form and manifestation, as unjust in its consequences.

Nor can we agree with counsel that " the present holders of the bonds are in no better condition than would be the railroad company." Although the bonds may not be commercial paper in the sense of the law merchant, yet they are negotiable. And the statute which authorized their issue makes them " negotiable paper which passes by indorsement or delivery, and is an important instrument of commerce. Where it bears on its face evidence of genuineness, and there is nothing to excite suspicion, the person who takes it *bona fide,* in the course of business, can enforce the payment of it, though it be not valid, as between the original parties. If on such paper

Maddox et al. vs. Graham & Knox.

the equities are open as between the persons who created it, its negotiability would be destroyed. And this principle applies equally to corporations as to individuals." (*Opinion of Justice McLean, of U. S. supreme court, in case of Zabriskie vs. Cleveland, Columbus, and Cincinnati railroad company, as reported in the Cincinnati Gazette.*)

In that opinion Judge McLean states what we all know to be a fact, from the history of the country, that within a few years past bonds payable to bearer to the amount of hundreds of millions have been issued in this country, and sold here and in foreign countries to *bona fide* purchasers. And then concludes, " if against the holders of these bonds technical objections can be raised, as to the mode of their being issued, when upon their face there is nothing to excite suspicion, but every thing to secure confidence, it would destroy all reliance in such paper."

It is manifest that the Judge would hear no such objections in his court. And he describes in very exact terms the case of the Maysville bonds.

The same doctrine is held and enunciated in full and strong terms by the supreme court of Pennsylvania in the Allegheny bond case.

Upon this constitutional question it is only necessary further to observe that the case of *Slack vs. the Maysville and Lexington railroad company* does not stand alone. It was preceded and has been followed in this court by quite a number of cases in which the constitutionality of such acts of the legislature as those now under consideration has been presented to this court in divers forms, and under different circumstances, and in every case such laws have been decided to be constitutional. (See *Talbot vs. Dent*, 9 *B. Mon.*, 526; *Withrow vs. Louisville and Nashville railroad company, MS. opin., winter term*, 1855; *Bardstown railroad vs. Hays, &c., MS. opin., winter term*, 1858.)

There has been a strong current of decisions to the same effect in other States of the Union. The opinions of this court heretofore rendered are sustained by the decisions of supreme and inferior courts in nearly half of the United States. (See *City of Bridgeport vs. Housatonic railroad company, with a note*

*containing a list of cases in which this question has been decided,* American Railway Cases, vol. 2, pp. 39–68.)

It is the opinion of the court that there is no error in the record. Wherefore, the order aforesaid granting the "*writ of mandamus*" is affirmed.