CHARLES J. HOLMES & others *vs.* FIRST NATIONAL BANK OF
FALL RIVER.

Bristol.   Oct. 25, 1878. — March 3, 1879.   ENDICOTT & LORD, JJ., absent.

A., in good faith, borrowed money of a bank, giving his memorandum check on a
third person as evidence of the amount of the loan, and delivered a certificate
of stock in a corporation, with a transfer on the back and a power of attorney,
signed in blank, as collateral security for the loan.   The bank then supposed
A. to be solvent.   Four days after, when the loan became due, A. paid the
interest in cash, and offered, in payment of the principal, a check on a third
person.   The cashier of the bank, supposing that the check was drawn against
funds, delivered to him the certificate of stock in the same condition in which it
was received, and also delivered to him the memorandum check marked as
paid.   A. had at this time no funds with the person on whom the check was
drawn, and had no reasonable expectations of having any to meet the check,
and was in fact insolvent.   Later in the day, A. redelivered the certificate of
stock, but not the memorandum check, to the bank.   *Held*, that the transaction
did not amount to a payment of the loan; and that the bank was entitled to
retain the certificate of stock as security for the loan, against the trustees of
the estate of A. in bankruptcy.

BILL IN EQUITY by the trustees in bankruptcy of the estate of
Alexander D. Easton and James T. Milne, formerly doing busi-
ness under the style of Easton & Milne, to compel the convey-
ance to them of certain shares of stock in two corporations,
alleged to have been conveyed by Easton & Milne to the
defendant, in fraud of the bankrupt act.   Hearing before *Ames*,
J., who ordered a decree to be entered dismissing the bill, and
reported the case, for the entry of such decree by the full court
as law and justice might require, upon the following facts:

On January 1, 1876, Easton & Milne procured of the defend-
ant a loan of $10,000, and gave the defendant therefor their
memorandum check on Richardson, Hill & Company, bankers,
of Boston, for that amount, merely as evidence of the amount of
the loan, and at the same time pledged to the defendant, as col-
lateral security for the loan, the shares of stock in question.
The loan was on demand, with the agreement that it should be
paid on January 5, and was made in good faith by the parties
thereto, the defendant supposing Easton & Milne to be perfectly
solvent.   The shares of stock were pledged by delivering the
certificates representing the same to the defendant, and by

Easton & Milne signing a transfer on the back of each certificate, in the following form: "For value received, we hereby sell, transfer and assign to ———— the shares within named, and authorize ———— to make the necessary transfer on the books of the company." The blanks in these transfers were not filled up at the time of depositing the certificates as collateral security, and no transfer was then made on the books of the corporations. Upon the face of the certificates was the following provision: "which shares are transferable only on the books of the company on the surrender of this certificate."

At about ten o'clock in the forenoon of January 5, Easton & Milne sent their clerk to the defendant bank, who paid in cash the interest due on the loan, and offered in payment of the principal Easton & Milne's check on Richardson, Hill & Company, for $10,000. The defendant's cashier, supposing this to be good and drawn against funds, took it, and, after stamping the memorandum check as paid, gave it with the shares and stock to the clerk, who took them away in the same condition in which they were when delivered to the defendant. The check, so received by the defendant, was sent forward by the afternoon mail of that day, in the usual course, to its correspondent in Boston, the National Bank of Redemption, for collection.

At about two o'clock on the same day, the treasurer of the Slade Mills, which had a large deposit at Easton & Milne's, drew, at the suggestion of Milne, two checks, as treasurer, upon Easton & Milne, for $10,000 each, and received therefor from Easton & Milne their checks for the same amounts on Richardson, Hill & Company, and took also, at Milne's suggestion, one of Richardson, Hill & Company's checks to the defendant bank, and exchanged it for a cashier's check of the defendant bank on the National Bank of Redemption, Boston, and took the other one to the Fall River National Bank, exchanging it in the same way for a cashier's check of that bank, also on the National Bank of Redemption. Both banks had funds at the National Bank of Redemption, and the cashier of each bank supposed the checks of Easton & Milne to be good. The check so received by the defendant was also sent forward in the afternoon of that day to its correspondent in Boston for collection. Milne ad-

mitted that, when these checks were drawn, they had not the funds to meet them with Richardson, Hill & Company.

Prior to this transaction, but on the same day, Easton & Milne came to the conclusion that they could not go on without help, and, after the transaction above described, they issued notices to the various banks in Fall River, proposing to them a meeting in the evening of January 5. On receiving this notice, the defendant's cashier, at about five o'clock in the afternoon, for the first time learned that the checks on Richardson, Hill & Company would not be paid on presentation; and, upon the cashier's inquiring of Milne, whether he considered it right to give such a check and take back the securities which had been given upon the loan, Milne agreed to return the securities to the defendant, and did return them in the same envelope, and in the same condition as when taken up by him. The memorandum check was not returned, and nothing was given in place of it.

In the evening of January 5, there was a meeting of the bank officers and Easton & Milne, at which the defendant and five other banks in Fall River were represented. It was stated that Easton & Milne required the sum of $100,000 to tide them over their embarrassment, of which $60,000 would be needed to meet checks on Richardson, Hill & Company, (including the two received by the defendant, and the one received by the Fall River National Bank,) which would be presented the next morning for payment. A long discussion ensued, and it was voted that it was expedient to sustain Easton & Milne in the interest of the credit of Fall River, but there was much discussion as to the manner in which it was to be done. It was finally agreed that the banks should furnish $60,000 to meet the checks payable the next day, and in order to help Easton & Milne along; that the defendant on its part, and as its contribution to this purpose, should provide for the payment of its two checks of $10,000 each, the Fall River National Bank for its check of $10,000, and another bank for checks of Easton & Milne to the amount of $2500; that this and other banks, which had no checks of Easton & Milne, should make up the remainder of the $60,000, and that all the banks should honor and pay such of Easton & Milne's checks as might be presented at their counters

the next day. At this meeting the defendant's president stated that his bank held the securities which are the subject of this suit, and nothing further was said in reference to them. It was also agreed that an investigation should be had into the affairs of Easton & Milne, to determine whether the $100,000, which they requested, should be furnished them to enable them to go on, and that in case it was finally decided to let them have that amount, then what the several banks did in taking care of the $60,000 of checks, and the checks paid by them on January 6, should be taken into account in the apportionment of the $100,000 between them. Several meetings of the banks were afterwards held with a view to arranging some plan to help Easton & Milne through their difficulties; trustees were chosen, and arrangements partially completed, and some banks placed some funds in their hands; but the whole matter was finally abandoned on January 8, and funds so placed were returned; and Easton & Milne thereupon closed their doors, and on January 17, upon their own petition, were adjudicated bankrupts, and the plaintiffs were subsequently chosen trustees to wind up their estate under the supervision of a committee of the creditors.

Immediately after the arrangement above made, the defendant drew its check on its Boston correspondent for the amount of the checks and $6000, which it advanced on the account of one of the other banks, supposing it was to be repaid by that bank. Some discussion took place as to how the funds should be sent to Boston, and it was finally agreed that the checks representing them should be made payable to the order of Easton & Milne, and that they should send the same by a special messenger to Boston on the first train in the morning, to meet the checks that would be presented at Richardson, Hill & Company's. This was done, and the checks received by the defendant from Easton & Milne were taken up in that way. Neither of the checks was returned to the defendant, but the defendant stated in reply to a question from the court that it made no claim under the checks.

The firm of Easton & Milne was in fact insolvent on the morning of January 5, although Milne testified that in giving the check to the defendant in the forenoon he acted in good faith; one of the defendant's witnesses, however, testified that

Milne admitted to him, during the evening of January 5, that he had his misgivings about the matter at the time he gave the check. There was evidence that in the forenoon of January 5 the credit of Easton & Milne was good. Milne also testified that, after giving the $10,000 check to defendant in the fore-noon, there was a change in the affairs of the firm; that they had a large call for funds from their depositors, amounting to between $25,000 and $30,000; but it appeared that part of this sum was the two checks amounting to $20,000 drawn by the treasurer of the Slade Mills at his, Milne's, suggestion, and that the call was not the result of any new obligations contracted by the firm.

It did not appear that Easton & Milne had any general authority to overdraw their account with Richardson, Hill & Company, although such overdrafts had occasionally been allowed by special permission, or when paper or valuable securities were in the hands of the drawees to be disposed of. There had been some instances in which such overdrafts had been acquiesced in without previous permission. The account of Easton & Milne was overdrawn at the time of all the transactions above described. Neither Easton & Milne, nor their trustees, have ever paid or offered to pay the amount lent except as above; and the same never was paid unless the above was a payment.

The shares of stock were transferred upon the books of the several companies to the defendant on the day following the re-delivery of the certificates to the defendant's cashier, and were sold some time in the fall of 1876 by the defendant for non-payment of the loan, bringing less than the amount of the loan, and are now held by the defendant.

The plaintiffs contended that the transaction in regard to the sending the money to Boston amounted to a new loan by the defendant to Easton & Milne; that the loan, which the shares of stock in question were pledged to secure, had been paid by the check received by the defendant from Easton & Milne; that the delivery of the shares of stock to Milne in the forenoon of January 5 was a surrender and termination of the pledge; and that the shares of stock were not legally re-pledged.

The judge found as a matter of fact, upon the evidence thus

reported, and upon the transaction above described, that the original loan of $10,000 from the defendant to Easton & Milne, upon which the collateral security above described was given, had never been paid; the check upon Richardson, Hill & Company, which was offered in payment therefor, having been drawn with no funds and no reasonable expectation of funds in the hands of the drawees to meet it, and with no reasonable expectation that it would be honored by the drawees.

*G. Marston & M. Reed*, for the plaintiffs.

*J. M. Morton, Jr.*, for the defendant.

COLT, J. There is nothing in the report of this case which leads us to doubt that the decree ordered by the single justice of this court, at the hearing before him, was right.

The bank acquired the shares of stock in question by a title valid against proceedings in bankruptcy. They were received as security, at the time the debt was contracted, January 1, and did not constitute a preference. The check of Easton & Milne, drawn on their Boston bankers, and given to the bank in the forenoon of January 5, upon the surrender of the stock certificates, was not a payment of the debt, because it was drawn with no funds, and no reasonable expectation of funds, in the hands of the drawees, to meet it, and no reasonable expectation that it would be honored. *Taylor* v. *Wilson*, 11 Met. 44, 51. The delivery of the securities did not terminate the pledge, or transfer the title of the bank, because they were obtained wrongfully; the act of returning them was not a new pledge, but simply restoring the bank to its rights. *Way* v. *Davidson*, 12 Gray, 465.

The principal question is, whether the transactions between the parties in the after part of the same day (January 5), amounted to a payment of the debt for which the securities were pledged. This is a question of fact upon the evidence reported, upon which the finding of the single judge will not be reversed, unless it appear to be clearly erroneous. *Reed* v. *Reed*, 114 Mass. 372. *Montgomery* v. *Pickering*, 116 Mass. 227.

It appears that, upon the discovery of the fact that Easton & Milne were in failing circumstances, it was proposed that the several banks in the city should raise a sum of money

to be apportioned among them, sufficient to carry the firm through its difficulties. Pending the completion of this arrangement, the defendant bank, with its own funds, took up the checks, which it had received of the firm, drawn on its Boston bankers; and was left in the condition in which it was before it received the check of the firm, and gave up the securities. No part of the money to pay these checks was furnished by the firm. If the plan had been carried out, then the amount apportioned would have been a new loan; but it was abandoned, and the defendant's right to its securities remained as before. It cannot make any difference, that the checks were taken up in the name of the firm, and that the bank received nothing in place of the checks. The real nature of the transaction is to be considered. The president of the bank had stated to all parties interested, when the plan for relief was under consideration, that the defendant held these securities, and there is no evidence of an understanding that they were to be given up. They were securities for the loan; and the loss of the memorandum check, or its delivery to the firm without payment, would not discharge the claim of the bank upon them. The evidence of payment, afforded by the course pursued and the forms adopted, is controlled by the undisputed circumstances and the real intention of the parties. The defendant is entitled to the benefit of the presumption, that it could not have intended to give up its securities until its debt was actually paid. *Butts* v. *Dean*, 2 Met. 76. *Curtis* v. *Hubbard*, 9 Met. 322, 328. And, upon the whole, the clear preponderance of the evidence is in favor of the validity of the defendant's title.

*Bill dismissed, with costs.*