Argued January 19; affirmed March 30, 1943

IN RE HATTREM'S ESTATE

LIVESLEY ET AL. *v.* PIONEER TRUST CO. ET AL.

(135 P. (2d) 777)

Before Bailey, Chief Justice, and Belt, Rossman, Kelly, Lusk, Brand and Hay, Associate Justices.

*Bert S. Gooding* and *O. G. Larson,* both of Portland (Stott & Gooding, of Portland, on the brief), for appellant.

*Custer E. Ross,* of Salem, for respondents T. A. Livesley and John J. Roberts.

*John A. Heltzel,* of Salem, for respondent Pioneer Trust Co.

ROSSMAN, J. This is an appeal by the contestants from an order of the circuit court which allowed the claim of Thomas A. Livesley and John J. Roberts in the amount of $3,591.07 against the estate of Andreas J. Hattrem, who died in this state May 5, 1923. The contestants were Weber A. Hattrem, a son of the deceased, Edna H. Bendixen, a daughter of the deceased, and the American Surety Company of New York, a judgment creditor of Weber A. Hattrem, and as such a garnisher of his interest in the deceased's estate. The Pioneer Trust Company of Salem is the administrator *de bonis non* of the estate. It neither approved nor rejected the claim. Upon appeal, it is assuming the status of a stakeholder. The appellants are the aforementioned contestants. Weber Hattrem was originally appointed administrator. Later he was removed and the Ladd & Bush Trust Company, a predecessor of the Pioneer Trust Company, was appointed administrator *de bonis non.* After notice of appeal was given Weber Hattrem died. O. G. Larson, administrator of his estate, was thereupon substituted for him.

The order under attack was based upon a finding that Livesley and Roberts had defrayed all of the expenses of prosecuting to a successful conclusion a law action in the state of Missouri in which those two men, together with the administrator (Missouri ancillary administrator) of the deceased's estate were the plaintiffs. The action terminated in 1939 by the entry and payment of a judgment in the amount of $10,550.92 in favor of the plaintiffs. The estate had a one-half interest in the judgment. Livesley and Roberts had the other half. According to the claimants, they ad-

vanced $2,650 for attorneys' fees and $1,953.90 for incidentals during the pendency of the action. The attorneys charged, and have been paid, a fee of $4,520.36. Upon payment of the judgment ($10,550.92) the attorneys and the Missouri ancillary administrator split that sum in two—one-half for Livesley and Roberts and the other half for the estate—but, before doing so, deducted $1,870.36, the unpaid balance of the fee ($4,520.36 minus $2,650). Thus, $935.18 was deducted from each half. That having been done, the attorneys remitted to Livesley and Roberts $4,340.28, less some minor deductions which are not material to our purposes. The Missouri ancillary administrator at the same time sent to the Pioneer Trust Company $4,340.28 ($5,275.46 minus $935.18). The claimants urge that from the sum of $4,340.28 there should be paid to them one-half of the aforementioned sums of $2,650 (cash paid to the attorneys as fees by Livesley and Roberts during the course of litigation) and $1,953.90 (incidentals for which Livesley and Roberts paid), together with interest upon one-half of those sums. It will be observed that the estate had borne only one-half ($935.18) of the unpaid balance of the attorneys' fee, and has borne no part whatever of the incidentals. The aforementioned sum of $4,340.28 is the only asset which the administrator now possesses.

The amount of the claim is $3,601.92. It is constituted as above indicated; that is, one-half of $2,650 (attorneys' fees) plus one-half of $1,953.90 (incidentals), plus one-half of $2,599.93 (interest upon the various advances from the day each was made to the time when the claim was filed).

The following states the circumstances out of which the claim arose. In and prior to 1911 Thomas A.

Livesley was engaged in the hop business under the name of T. A. Livesley & Company. In that year he and one Andreas J. Hattrem, who was in his employ as a salesman, formed a partnership under the name of A. Hattrem & Company for the purpose of dealing in hops. The partnerships did not succeed to the business carried on under the name of T. A. Livesley & Company; the latter continued. The agreement which created A. Hattrem & Company was evidenced by a writing which the two men signed. Under its provisions Livesley purchased the hops which the firm sold, fixed their price, collected the amounts receivable, advanced the needed sums of money, and, in general, managed the business. Hattrem was the salesman and sold the hops. He spent virtually all of his time in the East and Middle West. The agreement made his traveling expenses while he was engaged in the business of the firm a partnership expense. It further provided: "The profits shall be divided between the parties hereto equally," and that losses should be borne on the same basis.

In 1915 the aforementioned John J. Roberts became a partner to Livesley. The name of the business was T. A. Livesley & Company. Although the agreement which created A. Hattrem & Company was not amended at that time, nevertheless, the three men from that point on regarded Roberts a partner in the firm of A. Hattrem & Company. Hattrem had a half interest, Livesley a third, and Roberts a sixth interest. The partnership between Livesley and Roberts was dissolved in 1925. Thereafter each of them continued individually in the hop business. Livesley continued to entitle his business T. A. Livesley & Company.

The books of the partnerships of A. Hattrem & Company and of T. A. Livesley & Company were kept

in the offices of the latter firm by Livesley's book-keepers. Once each year Hattrem came to Salem, inspected the books, consulted with Livesley and Roberts, and then a settlement for the past year's business was effected. The firm of A. Hattrem & Company kept no account in a bank. T. A. Livesley & Company was its depository.

In 1921 Hattrem became so ill that he sold no more hops. He died May 5, 1923. From 1921 to the time of his death the sole business conducted by A. Hattrem & Company consisted of the collection of accounts receivable.

April 23, 1920, A. Hattrem & Company sold 150 bales of hops to a partnership entitled Danciger Brothers of Kansas City, Missouri. Before the time for delivery arrived Danciger Brothers claimed that the contract was void for illegality and refused to accept the hops. The claim of illegality was based upon a contention that the buyers, with the knowledge of the vendors, proposed to use the hops for purposes which were violative of the existing prohibition laws. In November, 1921, an action was instituted in the circuit court of Jackson county (Kansas City), Missouri, against Danciger Brothers to recover $9,624, damages for the alleged breach. The plaintiffs were A. Hattrem, T. A. Livesley and John J. Roberts. The complaint in that case ushered in a course of litigation which four times made its way through the trial courts of Missouri and three times to the supreme court of that state. Twice a writ of certiorari was requested of the United States Supreme Court, and each time was rejected. In the meantime Hattrem died. In Oregon a domiciliary administrator was appointed for his estate, and in Missouri an ancillary administrator (Floyd E. Jacobs) was appointed.

It will be observed that the action against Danciger Brothers was instituted after Hattrem's illness had caused a suspension of the sales of hops and had confined the business of A. Hattrem & Company to the collection of existing accounts. The evidence satisfies us that the action against Danciger Brothers was regarded by the three partners as a venture outside of the partnership business. Only one item of expense attendant upon it—a fifty-cent item—was entered in the partnership books and deemed a partnership expense. With the exception of that single item, all other expenses connected with the handling of the case were defrayed by Livesley and Roberts.

After the death of A. Hattrem and the appointment of his son, Weber A. Hattrem, as administrator of the estate, the arrangement was continued for the conduct of the litigation independent of the other affairs of the estate. For instance, June 7, 1923, Weber Hattrem, as administrator, wrote to Livesley:

"Messrs. T. A. Livesley & Co.,
Salem, Ore.
Gentlemen:
Re: *Danciger Brothers Case*
In accordance with our conversation, and as a matter of record this will confirm our understanding regarding the above mentioned case which is pending at this time, that W. A. Hattrem, Administrator of the estate of A. Hattrem is to assume or share equally with you in all expenses incident to the prosecution of said case, or that has already been incurred, and share equally with you in all profits accruing from said deal.

Very truly yours,
W. A. Hattrem,
Adm. Estate of A. J. Hattrem.''

We are satisfied that the conduct of the litigation was deemed by the three partners as an item independent of the partnership—in the nature of a joint venture.

So far we have stated the payments made by Livesley and Roberts as though the objectors concede that the expenditures actually were made. They, however, deny all payments and demand that the claimants substantiate their claims with proof. Section 19-704, O. C. L. A., says that a claim which was rejected by an estate's representative or upon which no action whatever was taken for sixty days may be presented to the court for allowance. It provides, however, that "no claim which shall have been rejected by the executor or administrator, as aforesaid, shall be allowed by any court, referee or jury, except upon some competent satisfactory evidence other than the testimony of the claimant."

The objectors claim that the record is devoid of "competent satisfactory evidence other than the testimony of the claimant" in support of the claim. Let us now examine the record for the purpose of seeing whether the demands of § 19-704 have been met.

We shall first consider the part of the claim which is based upon the alleged amounts paid to the attorneys. That part of the claim is as follows:

| | | | |
|---|---|---|---|
| 12-29-20 | C. H. Thompson | $ | 200.00 |
| 11- 1-21 | John H. McNary | | 350.00 |
| 9-20-27 | C. H. Thompson | | 500.00 |
| 6-28-28 | C. H. Thompson | | 350.00 |
| 7-24-31 | J. M. Johnson | | 300.00 |
| 2-28-33 | J. M. Johnson | | 150.00 |
| 6- 7-33 | J. M. Johnson | | 150.00 |
| 7-10-36 | Johnson, Garnett & Quinn | | 350.00 |
| 4-18-36 | Johnson, Garnett & Quinn | | 300.00 |
| | | | $2,650.00 |

According to the evidence, A. Hattrem & Company, when Danciger Brothers renounced liability for the hops, employed John H. McNary, a member of the Oregon bar, located in Salem, to take whatever course was necessary to secure redress for the wrong. McNary, in turn, employed James M. Johnson, a member of the Missouri bar, whose office was located in Kansas City, to handle the matter. According to the record, Johnson represented A. Hattrem & Company from the inception of the litigation until his death in March, 1935. Johnson was assisted in the first trial by Francis M. Hayward and Charles H. Thompson, both members of the Missouri bar, with offices in Kansas City. After the close of the first trial, Hayward participated no further in the litigation, but Thompson maintained his connection with it until its end. Upon the death of James M. Johnson, his son, Donald W. Johnson, Charles V. Garnett and James Patrick Quinn formed a firm entitled Johnson, Garnett & Quinn, which, together with the aforementioned Thompson, handled the litigation until the recovery and payment of the judgment. Garnett was the member of the firm who actually attended to the case.

The litigation was begun by a complaint which was filed in November of 1921. After the issues had been made up and the trial upon them had begun, the plaintiffs discovered an insurmountable procedural difficulty and voluntarily dismissed the action. Then a new complaint was thereupon filed which stated the cause in 150 counts, one for each bale of hops. The second trial occurred in 1927 and resulted in a verdict in the plaintiffs' favor for $9,000. Upon appeal, the judgment was reversed: 328 Mo. 458, 41 S. W. (2d) 389, 77 A. L. R. 1237. Although the judgment was reversed, the defendants found that the parts of the opinion

which dealt with the alleged illegality were so unsatisfactory to them that they sought a writ of certiorari from the Federal Supreme Court. It was denied: 284 U. S. 675, 52 S. Ct. 130, 76 L. Ed. 571.

The third trial began January 30, and ended February 2, 1933. It resulted in a verdict and judgment for the defendants. This time the plaintiffs appealed. In September, 1935, the matter was submitted to the court and resulted in a reversal: 339 Mo. 91, 95 S. W. (2d) 1193.

The fourth trial was begun April 5, 1938. Seemingly, the disposition made of the cause upon the second appeal demanded that the plaintiff submit evidence which was obtainable only in New York, Chicago and St. Louis. Garnett made a trip to two of those cities and obtained the needed testimony by the process of deposition. At the close of a five-day trial a verdict was won in the amount of $9,624. The resulting judgment was affirmed in 344 Mo. 1042, 130 S. W. (2d) 588. Again, the defendants sought a writ of certiorari from the Federal Supreme Court and again were unsuccessful: 308 U. S. 607, 60 S. Ct. 144, 84 L. Ed. 507. November 22, 1939, the judgment was paid.

Garnett swore that 50 per cent of the amount recovered by the judgment would have constituted a reasonable and customary charge for the legal services. He also swore that when this piece of business was entrusted to the attorneys no contract was made for a fee. According to him, after the decision upon the second appeal, the clients and attorneys agreed that the latter should be paid $300 more and should also have 40 per cent of the amount to be recovered upon the contemplated favorable judgment. The plaintiffs were, however, to be credited with all amounts already

paid, and everything embraced by the 40 per cent additional credit (in excess of sums already received) was made contingent upon success. Garnett, referring to the time after the judgment had been recovered and the fees had been paid in full, swore: "The net result is that the total paid to all attorneys involved in the case was 40 per cent of the amount of recovery, plus $300." That statement is evidence that there actually was paid to the attorneys $4,520.36 (40 per cent of $10,552.92 plus $300).

Not only do we have Garnett's sworn statement that $4,520.36 actually was received by the attorneys as their fee, but, in addition, we have bookkeeping entries, letters written by the attorneys acknowledging payment of fees, and fourteen canceled checks totaling $2,100, payable to the attorneys and bearing their endorsements. Seven of those checks were signed by Roberts and the other seven by Livesley. Each of Livesley's checks was twice the sum of each of Roberts'—they were sharing the payment of the fees in the proportion of two to one.

In addition to the fourteen checks, the evidence discloses bookkeeping entries for two additional payments to the attorneys, one on December 29, 1920, to C. H. Thompson for $200, and another on November 1, 1921, to John H. McNary for $350. The fourteen checks in the amount of $2,100 and the two payments just mentioned, totaling $550, indicate that an aggregate of $2,650 was paid to the attorneys.

Two of the fourteen checks (the two dated April 18, 1938) amount to $300. They brought to the attorneys the last payment upon the fees made by Livesley and Roberts. By starting with those two checks, we shall review parts of the record which further show that

the attorneys actually were paid $4,520.36—including the $2,650 mentioned in the claim. Roberts' check was for $100 and was payable to Johnson, Garnett & Quinn. Livesley's bears the same date, was payable to the same firm of attorneys and its amount was $200. Both checks bear the endorsement of the payees, and the bank's perforations indicate that each was paid April 23, 1938.

It will be recalled that the last trial (the one which resulted in the entry of the judgment which eventually was paid) was begun April 5, 1938. April 5 was thirteen days before the issuance of the two checks just mentioned. November 12, 1937, Johnson, Garnett & Quinn wrote to Roberts a letter in which they stated:

"When these two letters are read together and the employment of outside counsel is eliminated therefrom, the proposal regarding fees amounts to this: That we be paid a fee of $300 for the coming trial and in the event of a recovery, that we be paid an additional fee equal to 40% of the amount recovered and collected, less all fees heretofore paid in cash."

In a letter dated November 18, 1937, Roberts replied:

"We take it that your fee of $300 can be made payable immediately after time of trial, or in case of compromise at a prior date. You can arrange for date of trial to suit your convenience. * * *"

April 15, 1938, the aforementioned verdict for the plaintiffs having been won, the attorneys wrote to Roberts:

"On reviewing our correspondence, I note that in our letter of November 12, answered by us (you) on November 18th, an arrangement was worked out whereby we would be paid a cash fee of $300 for conducting the trial which has just closed and, in addition, we are to have a contingent interest of 40% of the total amount ultimately collected, less

approximately $2,000 which has been paid as attorneys fees. You may let us have your check for the $300 cash fee at any time that suits your convenience.''

April 18, 1938, Roberts wrote to the attorneys:

"* * * In accordance with agreement, we enclose herewith Mr. Livesley's check for $200 and the writer's check for $100, aggregating in all $300.''

The two enclosed checks were the ones we previously described. November 22, 1939, the attorneys wrote to Roberts:

"* * * As indicated by our letter to you, dated· yesterday, the judgment and interest amounted to $10,550.92 and that amount was divided equally between Floyd E. Jacobs as administrator of the Hattrem estate, and us as your representatives. Thus, we received the sum of $5,275.46 as one-half of the judgment, and Mr. Jacobs received the same amount as the other one-half. * * * So, also, all questions as to proper reimbursement to you and Mr. Livesley for the expenses advanced in this litigation should be determined by the Oregon administrator and settlement of those matters should be made in Oregon rather than in the probate court here. * * * With reference to our fees, as per our contract, we are entitled to 40% of $10,550.92, less the sum of $2,350.00, so that the total amount due us for fees is $1,870.32. Floyd E. Jacobs, as administrator of the Hattrem estate, has paid us as directed by the enclosed order, one-half of this amount, leaving us entitled to deduct from your one-half of the judgment, the sum of $935.19.''

From the foregoing we see that the attorneys acknowledged receipt of $2,350 paid to them by Livesley and Roberts. In addition, they received, through the medium of the two checks dated April 18, 1938, $300 more. The reason their letter of November 22 did not mention the latter sum is obvious—their fee was to be

40 per cent of the amount recovered, plus $300. Therefore, from 40 per cent of $10,550.92 they deducted, not $2,650, but $2,350. Hence, we see that we have documentary proof emanating from the attorneys showing that Livesley and Roberts paid them during the course of the litigation $2,650 in cash.

■ In addition to the evidence just mentioned, we have journal entries covering all of the payments. But it is unnecessary to review them and other items of proof bearing upon the payments made to the attorneys. The evidence which we have mentioned in detail is uncontradicted. Everybody knows that litigation costs money and, certainly, the sums paid to the attorneys for this extensive litigation, conducted in courtrooms seventeen hundred miles from the home of the clients, and involving four trials and three appeals, were not excessive. It is obvious that the evidence just reviewed complies with the requirements of § 19-704, O. C. L. A.

The next feature of the claim which we shall consider is the part which seeks recovery for various amounts expended by Livesley and Roberts for incidentals: Printing, telegrams, filing fees, etc. The total of the alleged expenditures is $1,953.90. In the following statement of them we include a fifth column, which indicates by symbols the nature of the documentary corroborative evidence. The numeral (1) means that the expenditure is evidenced by an entry in the journal of Livesley; (2) means that the expenditure is evidenced by a canceled check of Livesley or Roberts or by checks of both; (3) means that the expenditure is evidenced by a letter written by the recipient of the check, generally a letter of acknowledgment; and (4) means that the expenditure is supported by a state-

628

ment of account, generally one that is marked paid. We have entered the numeral (1) opposite only the first six items; seemingly, all of the others are supported by bookkeeping entries, although the witnesses did not always mention that fact. The statement follows:

| 1 | 9-24-20 | Western Union—<br>to Danciger Bros. | $ 4.56 (1) |
| 2 | 9-24-20 | Western Union—<br>to Danciger Bros. | 3.24 (1) |
| 3 | 9-25-20 | Western Union—<br>to Danciger Bros. | 7.74 (1) |
| 4 | 1- 4-21 | C. H. Thompson—filing fees | 20.00 (1) |
| 5 | 10-25-21 | Emma Murphy Brown—<br>depositions | 24.00 (1) and (4) |
| 6 | 4-27-22 | A. Hattrem—expense<br>to Kansas City | 267.10 (1) |
| 7 | 6-15-22 | Court reporter—Kansas City | 16.65 (3) |
| 8 | 9- 1-22 | C. H. Thompson—recording fee | 26.00 (3) |
| 9 | 2- 9-27 | John J. Roberts—<br>expenses, Kansas City | 275.49 (2) |
| 10 | 4-18-27 | Court reporter—Kansas City | 11.25 (2) and (4) |
| 11 | 12-11-29 | Western Union—<br>to Thompson and Johnson | 3.78 (2) and (4) |
| 12 | 1-28-30 | Printing—writing brief | 71.25 (2) and (4) |
| 13 | 9- 4-31 | Western Union—to J. M. Johnson | 2.22 (2) and (4) |
| 14 | 9-21-31 | Printing Abstract of Record | 210.95 (2) and (3) |
| 15 | 6- 7-32 | Western Union—to J. M. Johnson | 2.04 (2) and (4) |
| 16 | 11- 7-32 | Western Union—to J. M. Johnson | 3.95 (2) and (4) |
| 17 | 2-15-33 | John J. Roberts—expenses,<br>Kansas City | 224.73 (2) and (4) |
| 18 | 2-15-33 | Airmail to Kansas City | 23.79 Memo. |
| 19 | 2-23-33 | Western Union to J. M. Johnson | 2.64 (2) and (4) |
| 20 | 7-14-33 | Appeal expenses—<br>Supreme Court | 411.50 (2) and (3) |
| 21 | 12-14-35 | Appeal expenses—<br>Supreme Court | 165.00 (2) and (3) |
| 22 | 4-18-38 | John J. Roberts—expenses,<br>Kansas City | 173.12 (2) and (4) |
| 23 | 4-26-38 | Western Union—Johnson,<br>Garnett & Quinn | .50 (2) and (4) |
| 24 | 6- 9-38 | Western Union—Johnson,<br>Garnett & Quinn | 2.40 (2) and (4) |

It will be seen that only five of the items, totaling $302.58, are supported by no documentary evidence except bookkeeping entries. Of those five, No. 6, which is based upon Hattrem's expenses to Kansas City, is also supported by the testimony of Frank Needham, who was Livesley's bookkeeper in 1922. Needham swore that Hattrem was compelled to make a trip to Kansas City on account of the Danciger litigation. He testified that $267.10 was paid to Hattrem and that the entries concerning it appear not only in Livesley's journal, but also in his ledger. He produced both. The eighth item is supported by proof typical of four more of the items (7, 14, 20 and 21) and, hence, we shall describe it. The supporting proof for that expenditure is a letter dated September 6, 1922, addressed to T. A. Livesley & Company and signed by Charles H. Thompson. It says:

"I have your check of September 1st, 1922, for $26.00, covering Court costs in the case of Hattrem et al. vs. Danciger et al., and thank you very much for your prompt attention to the matter."

It will be observed that many of the expenditures were for telegrams to Kansas City. All of those expenditures, with the exception of the first three, are evidenced by the check which paid for the messages, together with the statement rendered by the telegraph company. Each check bears perforations indicating its payment and all of the statements are marked paid. The tenth item is evidenced in substantially the same way. The charge was stated on the billhead of William Ballinger, a court reporter, and identifies the service rendered as "Transcript of Testimony of A. Hattrem at trial, Division Two, May 19, 1922, 75 folios at 15c— $11.25." Payment was made by a check of Roberts

dated April 18, 1927, in the amount of $11.25 payable to Ballinger. The perforations indicate that the check was paid by the bank April 27, 1927. Item 12 is supported by evidence of substantially the same kind. Item 18 is supported by notations made by James A. Byers, Livesley's bookkeeper in 1933, upon a printed office memorandum form entitled Cash Paid Out, and by explanatory testimony of Byers. The entries indicate that $23.79 was paid February 15, 1933, for sending by airmail a book to Kansas City. Byers recalled the expenditure and said that the book, which was mailed, was a corporation record book of T. A. Livesley & Company needed in the trial of the Danciger case. The third trial began on the day when the book was mailed. There remain for explanation only three more of the items—9, 17 and 22. Each of them is based upon expenditures which Roberts made upon trips to Kansas City, one in February, 1927, a second in February, 1933, and the third in April, 1938. Each trip was necessitated by the fact that Roberts testified in those three trials. His home was in Salem.

According to Byers, and Livesley's record, Roberts was given a check of T. A. Livesley & Company for $350 February 9, 1927, immediately before he left for Kansas City to testify in the second trial. Byers produced the canceled check. Roberts' name appears endorsed upon the reverse side, and the perforations indicate that the bank paid the check February 10, 1927. Upon his return to Salem, Roberts issued to Livesley one of Roberts' checks for $120.43. It, like Livesley's, is one of the exhibits before us. Livesley cashed it March 12, 1937. Miss Drager, Roberts' bookkeeper, explained that Roberts always kept a daily detailed record of his expenses and that upon his return from Kansas City he gave her the records. These

she could not produce. According to the entries which she made in Roberts' books, the expenditures amounted to $275.49. Since Roberts' interest in the Danciger case was one-sixth (Hattrem estate, one-half, Livesley, one-third, Roberts, one-sixth), one-sixth of the expenses was Roberts' share. One-sixth of $275.49 is $45.91; $350 plus $45.91 is $395.91; $395.91 minus $275.49 is $120.42, the amount Roberts returned. The checks and the explanation given by Miss Drager constitute the corroborating evidence for this item.

Item 17, being Roberts' expenses upon the third trial, is corroborated by (1) a check of Livesley for $200 and a rebate check of Roberts for $58.11; (2) a statement of expenditures which Roberts prepared and delivered to Livesley after his return; and (3) the testimony of Byers and Miss Drager. Before Roberts left for Kansas City, Livesley gave him a check for $200. This time Roberts bore one-third of the expenses, and upon his return gave Livesley a rebate check for $58.11. His expenses upon the trip were $224.73. The two checks and the statement are before us as exhibits.

The expenses incurred by Roberts upon the fourth trial are corroborated by (1) a check from Livesley for $150 and a rebate check from Roberts for $34.59; (2) a daily expense ticket for each day that he was away from home; (3) a typewritten statement of expenses which he rendered to Livesley upon his return accompanied by the daily expense tickets; and (4) the testimony of Byers and Miss Drager. All of this evidence shows that his expenses were $173.12. He bore one-third of them. All of the papers just mentioned are before us as exhibits.

In all of the three instances just mentioned Livesley's checks bore the name of T. A. Livesley & Com-

pany as drawers. The actual signature was appended by Needham upon the first of the three, and by Byers to the other two. This completes the review of the corroborative evidence.

From the foregoing we see that all of the twenty-four incidental expenditures are supported by documentary corroborative evidence, and that only five of them are corroborated by bookkeeping entries only. At least five of the expenditures are supported by the testimony of the bookkeeper who handled the transaction. In those instances, the bookkeeper possessed a recollection of the transaction.

Let us now determine whether the bookkeeping entries, canceled checks, statements of account, letters acknowledging receipt of payment and the office memorandum, all of which are above described, comply with the demands of § 19-704, O. C. L. A., which says that no claim which was rejected by an estate's representative shall be allowed by a court "except upon some competent satisfactory evidence other than the testimony of the claimant."

■ The purpose of statutes like § 19-704 is to withhold full effect from the testimony of a survivor when the other party to the transaction has been silenced by death. The fact that the rule arbitrarily yields that result has brought down upon it the criticism that "it favors the dead above the living, for it would rather see an honest survivor unjustly lose his claim than an honest decedent be made unjustly to pay; yet the equities being equal, the living person should rather be favored." Wigmore on Evidence, 3d ed., § 2065.

■ In the present instance, most of the claim is based upon transactions which occurred after Hattrem's death, and hence his estate lost no evidence

whatever concerning those items through death. Only ten of the expenditures (two for attorneys' fees and eight for incidentals) were made during Hattrem's lifetime. Twenty-two of them were made after his death. Bearing in mind the purpose of our statute, we believe that expenses incurred by the estate's representative are not "claims" of the type affected by § 19-704. See § 19-1009, O. C. L. A.; Schouler on Wills, 6th ed., § 2893; Woerner, The American Law of Administration, 3d ed., § 356; 21 Am. Jur., Executors and Administrators, §§ 349 and 363; 34 C. J. S., Executors and Administrators, p. 148, § 387; and *Nathan v. Freeman,* 70 Mont. 259, 225 P. 1015, 41 A. L. R. 138, and annotation at 144. However, in the present instance, since the corroborating proof is extensive, the distinction just made is not necessary.

■■ By reverting to the language of the statute, it will be seen that it was only "the testimony of the claimant" which is excluded from the category of corroborative proof; in fact, it is "the testimony of the claimant" which requires corroboration. Applying the rule of *expressio unius est exclusio alterius,* it is evident that all species of evidence, other than "the testimony of the claimant," is competent, satisfactory corroborative proof. A bookkeeping entry is not "the testimony of the claimant." It does not derive its cogency from the testimony of any person unless the books themselves are questions. Its cogency is derived from the fact that the entry was made in the regular course of business. The same observation is true concerning a statement of account such as those rendered by Roberts to Livesley upon his return from the trips to Kansas City. The statements were promptly audited, a rebate check was delivered to Livesley and the proper entries were made in the account books. It

became an account stated and derived its evidentiary value from that fact.

In *Radcliffe v. Chaves,* 15 N. M. 258, 110 P. 699, the court held that books of account constitute competent corroborative evidence under a statute which required such corroboration of claims against decedents' estates. We agree with that conclusion.

The very language of § 19-704, which excludes only "the testimony of the claimant," from the rank of corroborative proof, renders it clear that all of the evidence which is indicated by the symbols in the fifth column of our statement of the claim was competent satisfactory corroborative evidence. We add that none of it was contradicted.

The objectors, without challenging the relevancy of the evidence which we have been reviewing, state that the claimants failed to bring to the trial all of the account books of T. A. Livesley & Company and of A. Hattrem & Company. Their brief, referring to the account books of T. A. Livesley & Company, says:

"The journal of original entries was not produced (Tr. pp. 37, 38, 39) although demand was made for production of all books and records relating to transactions of Livesley and Roberts with the partnership firm of A. Hattrem & Company. * * * The claimants failed to produce the books of A. Hattrem & Company which would be the records of original entry from which Messrs. Needham and Byers, witnesses for claimants, testified for them * * *. The journals, check register and ledger of A. Hattrem & Company is missing, * * *."

The reply brief says:

"Appellants are convinced that if the original books and records of A. Hattrem & Company had been produced at the trial of the Livesley & Rob-

erts claims that they would have conclusively shown that all expenses of the Danciger case were paid prior to the death of Mr. Hattrem.''

We are not sure what point the contestants had in mind when they made those statements. It may be that they believe that since the claimants did not produce all of the books which the contestants demanded (if, in fact, all available were not produced) that the records which Livesley actually produced must be disregarded; or it may be that the contestants believe that, since some of the demanded books were not brought (if that is true), the entries in Livesley's books ought to be viewed with distrust. The latter, seemingly, is their real claim. But we will consider both propositions.

Before going on, we will take note of the above statement made in the reply brief. Clearly, that statement can not be true. It says that if the records of Hattrem & Company had been produced they would have ''conclusively shown that all expenses of the Danciger case were paid prior to the death of Mr. Hattrem.'' Hattrem died in 1923. For the next sixteen years the litigation continued. Only ten of the litigation expenses were incurred during Hattrem's lifetime. Twenty-two of them, being the major expenses, were incurred and discharged after his death.

It will also be seen that appellants' brief says: ''The check register * * * of A. Hattrem & Company is missing.'' That firm never had a bank account and, hence, could have had no use for a check register.

It will be observed that the quoted words indicate that the contestants made demand upon the claimants to produce account books. The only Notice to Produce which we find in the record is one which directs the

claimants "to have for inspection and use of W. A. Hattrem and Edna H. Bendixen at the trial of your claim * * * all books, records, accounts and documents connected with, and relating to, the interests of Andreas J. Hattrem, T. A. Livesley and John J. Roberts * * * as partners or otherwise in the copartnership of A. Hattrem & Company and in the copartnership of T. A. Livesley & Company."

We find nothing in the record which could warrant a belief that any entries in account books would disclose "the interests of Andreas J. Hattrem * * * in the copartnership of A. Hattrem & Company and in the copartnership of T. A. Livesley & Company." The interests of Hattrem and of Livesley in the partnership of A. Hattrem & Company is evidenced by the articles of copartnership bearing their signatures which we have already described. It is conceded that Hattrem had a one-half interest in that partnership. No one questions that fact. Neither the contestants nor anyone else claims that Hattrem had any interest in the business known as T. A. Livesley & Company.

During the course of the trial, as shown by page 39 of the transcript of evidence (same page as is mentioned in the quotation from appellants' brief) contestants' counsel said: "I want to inform you we are asking for the following records of A. Hattrem & Company: The journal, the ledger and the cash book and the check register." Claimants' attorney replied: "I doubt if there were any such records; if there have been, I have not seen them. We have a purpose to introduce in evidence some records, and I don't think there is any objection to counsel's seeing them now. I think they were carried as separate sheets in the Livesley & Company records." At that point the pre-

siding judge made some inquiries of counsel at the conclusion of which he directed the claimants to comply with the request of the contestants so far as possible. The matter seemingly was closed with the following statement made by claimants' attorney: "I will ask Mr. Needham to bring forth the record and show it to those present." What record was brought forth is not disclosed by the transcript but seemingly it took care of the situation, for the contestants made no objection to the records which were then produced. Nor did they claim that anything which they sought was withheld.

The examination proceeded. In its course the witnesses read entries from account books and, in confirmation of them, produced supporting documents. The latter were received in evidence. In most instances the reception of the document was accompanied by a statement from the presiding judge: "Admitted without objection." However, towards the close of the trial the contestants' attorney while examining Needham encountered an entry in the Hattrem ledger made in 1924, which read: "Dec. 31 To close a/c to J J R and T A L 47J $12,847.15." Needham denominated it the closing entry of A. Hattrem & Company. At that point contestants' counsel declared: "I would like to have the record show that these heirs have demanded of the claimants that they produce all the records of T. A. Livesley & Company, and all the records of A. Hattrem & Company, and that the records explaining this entry are not here, which we have demanded." Without saying more concerning that matter, and without waiting for an explanation from the claimants, or a direction from the presiding judge, contestants' counsel continued: "Your Honor, we would like to have the page of this ledger marked for identification

Objector's Exhibit A.'' The page to which he referred
was the one which contained the entry which we
quoted. It was marked as requested and, pursuant to
stipulation, a copy of it was received as an exhibit in
lieu of the original. From that point on the examination
of the account books proceeded. Whether additional
account books were or were not brought forth, we
do not know, and hence can not determine whether the
demand to produce was fully complied with. Likewise,
we do not know what books actually were presented
for inspection, for none of them were introduced in
evidence as exhibits and none of the books which the
attorneys and witnesses employed during the course
of the examination were clearly identified. No further
demands to produce were made, nor was any effort
made to show that the claimants were able to produce
a book which purportedly was missing.

No objection to the introduction of evidence was
based upon a contention that a book of original entry
was missing and within the claimants' power to pro-
duce. Nor was any motion made to strike out evidence
on the ground that it had developed that supporting
evidence in the form of account books was missing and
in the possession of the claimants.

■ From the statements made by the witnesses and
the attorneys during the course of the examination,
we know that journals, at least two ledgers of Livesley
and one of Hattrem & Company, were employed dur-
ing the course of the examination. Livesley's journals
were his books of original entry. It is also apparent
that a book of original entry of A. Hattrem & Com-
pany was used by the witnesses and attorneys during
the examination. In the course of the latter it de-
veloped that a cash book was missing and could not

be found. Whose cash book it was is not indicated by the record. The books of A. Hattrem & Company contained no expense entries. That was due to the peculiar nature of the partnership. Hence, if the missing book was that of A. Hattrem & Company, it very likely would have cast no light upon any inquiry which the contestants were making. Moreover, it would seem as though the administrator of the deceased's estate would have possession of the partnership books, and that being true, he should have been looked to for them rather than the surviving partners. In view of the facts which we have just reviewed we can not say that the claimants possessed any books sought by the contestants which they failed to produce.

As we have said, none of the books from which Byers, Needham and Miss Drager read entries were received as exhibits. None of them are before us. The witnesses read the entries and that having been done produced whatever supporting documents, such as canceled checks, were available. Upon cross-examination, counsel for the contestants made use of the same books. No one asked the court to receive the books as part of the record. During the course of the examination, the trial judge remarked: ''As a matter of fact, most of the entries are read into the records and dates and amounts.'' Such was the procedure that was followed. No contention now before us is based upon the fact that the books have not been brought to this court. We know of no occasion for disregarding the evidence, gleaned from the books, because the latter themselves are not before us.

■ We express our conclusion that the claim, and every item of it, is supported by competent, relevant, satisfactory evidence, ''other than the testimony of the

claimants.'' We are fully satisfied that the claimants' corroborative evidence complies with the demands of § 19-704, O. C. L. A., which exacts ''some competent satisfactory evidence other than the testimony of the claimant.'' Nor do we know of any occasion for discounting any of the corroborative evidence through indulging in an inference that some book or record within the control of the claimants was withheld. We believe that it is remarkable that such a quantity of corroborative evidence was preserved for such an extended period. Virtually all of it is of a very high grade and shows that the alleged expenditures actually were made. Very few of the items are dependent solely upon the bookkeeping entries which the contestants attack. If the account books from which the witnesses read the first and fourth items of the claim (totaling $35.54) were not, in fact, books of original entry, an objection or motion to strike should have been made. But nothing of that sort was done. The credibility of Needham, Byers and Miss Drager is not even questioned by the appellants. We are satisfied with the evidence.

■ We have not fully stated contestants' contentions about the entry of $12,847.05 in the debit column of the ledger of A. Hattrem & Company under date of December 31, 1924. It will be remembered that the entry read in part: ''To close a/c to J J R and T A L.'' The initials stand for John J. Roberts and T. A. Livesley. Needham, who made the entry, said that it gave effect to a partnership accounting and closed the account of the firm. If that is true, then this proceeding can be conducted, even if it is in the nature of an action at law, and even if the Danciger case was not deemed by Hattrem, Roberts and Livesley as a joint venture. Seemingly, the contestants did not believe that an accounting ever took place.

It had been the practice of the three partners to have an annual accounting in Livesley's office in the early summer of each year. Weber Hattrem, administrator of his deceased father's estate, called upon Roberts and Livesley in the spring of 1923 with the request that he be given a check for the estate's share of the balance of the funds of the dissolved partnership. Before his request was granted Livesley showed Hattrem the account books of the firm. He had had extensive experience in financial matters and made some examination of the books. Besides examining the books he conferred with both Roberts and Livesley. In June, 1923, according to the ledger sheet and Hattrem's admissions, he was paid $3,148. Upon that occasion no deduction was made for the sums amounting to $1,119.29 which the surviving partners had by that time advanced upon the Danciger litigation. To the contrary, Hattrem, as administrator, upon the day he received the check for $3,148, signed the letter addressed to Livesley from which we previously quoted, and which expressly mentioned the Danciger case; it said:

"The estate of A. Hattrem is to assume or share equally with you in all expenses incident to the prosecution of said case, or that has already been incurred."

The latter words clearly indicate that nothing was deducted from the $3,148 check for expenses already incurred. Still later, the closing entry of $12,847.05 was made upon the above-described ledger page. Thereafter no further demand was made upon Livesley or Roberts for anything due to the Hattrem estate. To the contrary, the Ladd & Bush Trust Company, which succeeded Weber Hattrem as administrator, filed its final account and, in 1936, was discharged. We are sat-

isfied that the incident of June, 1923, was intended to be a final accounting and settlement of the partnership.

Not only do we believe that a settlement of the partnership account was made on June 6, 1923, but we also believe that an accounting was unnecessary to warrant the allowance of this claim. We quote from *McCredie v. McCredie,* 134 Or. 517, 294 P. 361, in which Mr. Justice KELLY said:

"In McDonald v. Holmes, 22 Or. 212, 218 (29 P. 735), Mr. Justice Lord says: 'One partner may sue another at law, where the cause of action * * * has been separated from it by explicit acts,' etc. We find that the explicit acts of delivering the coupons from the bonds in question to Walter H. McCredie, and on at least one occasion to plaintiff, and W. W. McCredie's promise 'never to touch them' so separated the subject-matter of this suit from the partnership as to bring this case within the principle just quoted. This principle is also announced in Wilson v. Wilson, 26 Or. 251, (38 P. 185). See also 21 A. L. R. 62, paragraph 3, for citation of authorities on this point."

See to the same effect 40 Am. Jur., Partnership, page 459, §§ 477 and 478, and annotation, 58 A. L. R., page 627.

■ Even if Weber Hattrem's action on June 6, 1923, did not effect an accounting, it, at least brought about a separation of the Danciger litigation from the other partnership assets, if the separation had not previously been effected. In other words, it made the handling of the litigation a joint venture. That being true, an allowance of this claim was not dependent upon whether or not a settlement of the partnership accounts had taken place. We, however, believe that a settlement was effected June 6, 1923.

■ So far we have not stated the fact that a decree of final settlement in the *Matter of the Estate of A. Hattrem, Deceased,* was entered before this claim was filed. One was entered February 13, 1936. On that day the probate court entered a decree of final settlement which approved a purported final account of the Ladd & Bush Trust Company as the estate's representative and discharged it from its trust. At that time Livesley and Roberts had not presented their claim.

Section 19-702, O. C. L. A., says:

"Until the administration has been completed, a claim against the estate not barred by the statute of limitations may be presented, allowed, and paid out of the assets then in the hands of the executor or administrator not otherwise appropriated or liable."

Generally, all claims which are not presented prior to the entry of the order of final discharge are barred from payment from estate funds: *In re Traaen's Estate,* 154 Or. 263, 59 P. (2d) 406, and *Brown v. Drake,* 103 Or. 607, 205 P. 1002, 210 P. 710.

It will be observed that the decree of final settlement was entered February 13, 1936. The judgment for the defendants entered in 1933 in the third trial of the Danciger case was not reversed until June 30, 1936, by the Supreme Court of Missouri. Hence, when the decree of final settlement was entered there was nothing available for the estate from the litigation. Obviously, the entry of the order of final settlement was premature. After the entry of the order, the fourth trial was held, but it was not until November 22, 1939, that the judgment entered in it was paid. It will be remembered that the sums collected upon the judgment were divided in Missouri between Floyd E. Jacobs, the Missouri ancillary administrator, and Roberts and

644

Livesley. The division was made after attorneys' fees and costs had first been deducted. After the division the Ladd & Bush Trust Company presented a petition to the county court for Marion county praying for an order reopening the *Matter of the Estate of Andreas J. Hattrem, Deceased.* The petition recited, among other matters, the fact that Jacobs had in his possession approximately $4,000 belonging to the estate, and that he refused to release the money "to anyone other than to decedent's domiciliary administrator." November 28, 1939, the county court entered an order which granted the desired relief. It recited:

> "Said ancillary administrator now has on hand about $4000 and has refused to distribute such proceeds to anyone other than to decedent's domiciliary administrator and has tendered such proceeds to this petitioner as such domiciliary administrator, and, it further appearing * * * that said proceeds have never been administered upon * * * and are in the nature of newly discovered assets so far as this estate is concerned and that it is necessary for such litigation proceeds to be administered upon in the domiciliary estate of decedent in Oregon. Now, therefore, it is ordered, adjudged and decreed, and the Court finds as facts, that there are newly discovered assets * * * and that it is necessary for the above entitled estate to be reopened and for said decree of final settlement dated February 13, 1936, to be set aside, and for petitioner to be reappointed as administrator *de bonis non* of said estate * * *."

The order "vacated, set aside and held for naught the order of February 13, 1936" and reappointed the Ladd & Bush Trust Company administrator *de bonis non.* It

> "ordered, adjudged and decreed that said Ladd & Bush Trust Company be, and it hereby is, author-

ized, empowered and directed to resume the duties of administrator *de bonis non* of said estate, only, however, as to said newly discovered assets, as aforesaid, and to administer upon and pay and distribute said litigation proceeds to the claimants and heirs entitled thereto after payment of all expenses of administration.''

From Woerner, The American Law of Administration, § 571, we quote:

"At common law the office of executor or administrator does not terminate during his lifetime, unless he be removed by a court of competent jurisdiction. * * * If, therefore, property of the deceased is discovered after the final settlement, the existence of which was then unknown and could not for that reason be administered, the administrator and his sureties will be liable therefor, and subject to the same proceedings against them as in respect of the property coming originally to the hands of the administrator. So their functions in other respects remain unextinguished after final settlement, and an order of discharge made by the probate court can be regarded as a discharge only so far as the particular matters appearing upon the face of the account are concerned. This feature of the functions of executors and administrators is stated by Surrogate Bradford in the following language: 'The formal discharge contained in a decree on final accounting operates only as to the accounts of the parties up to that period. The trust is an enduring one; other assets may be realized, new liabilities incurred, involving a continuance of duty and responsibility. A decree on final accounting does not destroy the relation of an executor, but only discharges him from liability for the past. * * *''

Thus, if the common law rule were in effect in this state, the administrator of Hattrem's estate would not

be deemed discharged from its trust, but, to the contrary, would stand charged with the estate's share of the Danciger judgment. There would be no occasion for the appointment of an administrator *de bonis non*. However, in Oregon, as in other states, provision is made for the final settlement of the accounts of executors and administrators. Upon approval of the final account the estate's representative is discharged. It was in that manner that the Ladd & Bush Trust Company was discharged in 1936.

Speaking of the American practice, Woerner, in The American Law of Administration, § 573, states:

"For it is obvious that there may be property of which the executor or administrator had no knowledge, and which is liable to be administered, although he may have made 'final settlement' in perfect good faith; * * * In all these cases there was in reality no final settlement of the estate in the sense that it included an accounting in respect of all the property liable to administration; and neither the plea of *res judicata* nor that of *plene administravit* can afford protection against creditors or distributees. It is therefore enacted that executors and administrators having made final settlement may relieve themselves of further liability by the order of the Probate court granting them a full or partial discharge."

From 34 C. J. S., Executors and Administrators, § 1018, at page 1274, we quote:

"An appointment *de bonis non* is proper when assets of the estate are newly discovered after the former executor or administrator has been discharged."

The office of administrator *de bonis non* is of ancient origin: Woerner, The American Law of Administration, 3d ed. § 179. In *American Board of Com-*

*missioners for Foreign Missions,* 27 Conn. 344, the court, referring to the title, administrator *de bonis non,* said:

> "* * * as the very words themselves import, such an administrator is called in only where there is specific property of the deceased remaining unadministered."

The early case of *Brattle v. Converse,* 1 Root (Conn.) 174, was an

> "Appeal from probate, stating that Josiah Converse late of Stafford, deceased, owed a debt to Wm. Brattle; that said Converse's estate has never been settled nor said debt paid; that there is no administrator or executor to whom to apply for payment of said debt, although there is a plentiful estate; and said Brattle moved said court to appoint an administrator.
>
> "The appellee's reply—That said Josiah died in A. D. 1775; that his widow was appointed administratrix, who advertised the creditors and paid off all debts that appeared; that said William went off to the enemy in A. D. 1776 and his said debt was not exhibited; that the remainder of said estate has been divided out among the heirs by agreement, acknowledged and recorded at the court of probate; since which said administratrix has died and no further administration ought to be granted. The court of probate refused to grant said motion."

The above is the statement of facts as reported. The following is the decision:

> "Judgment—That the denial of the court of probate be disaffirmed."

An administrator *de bonis non* may be appointed after any lapse of time, if his appointment is needed to complete the administration of the estate: *Bancroft*

*v. Andrews,* 6 Cush. (Mass.) 493. In the case just cited, Mr. Justice Metcalf said:

"* * * no statute limits the time of granting administration on estate not administered by a former administrator or executor. And in Kempton v. Swift, 2 Met. 70, a second administration was granted more than thirty years after the first."

█ It is well settled that an appointment *de bonis non* is the proper course to pursue when it is discovered that assets of the estate remain unadministered and the former executor or administrator has been discharged. See, in addition to the foregoing: Woerner, The American Law of Administration, §§ 179 and 352; Schouler on Wills, Executors and Administrators, 6th ed., § 1718; Bancroft's Probate Practice, § 1172; 24 C. J., Executors and Administrators, § 2736, page 1145; 21 Am. Jur., Executors and Administrators, § 776, page 841.

█ We are fully satisfied that the county court did not err when it made the order from which we have just quoted. The newly discovered assets fully warranted the court in appointing an administrator *de bonis non* to receive them and administer upon them. That conclusion is not adverse to the holding in *In re Traaen's Estate,* 154 Or. 263, 59 P. (2d) 406, cited by the contestants. In the Traaen case, an individual, who described herself as a creditor of the deceased's estate, sought the appointment of an administrator *de bonis non* to administer upon some assets which she said were newly discovered. The probate court denied the petition. Our decision affirmed that order upon the ground that, although the petitioner's alleged claim was due and payable at the time of the death, it had not been presented. We held that she presented no justifiable ex-

cuse for having withheld the presentation of her claim. Under the circumstances, we were compelled to assume that she had no claim and, therefore, had no right to ask for an administration *de bonis non*. In the present instance, it is not a claimant, but the former administrator that seeks the reopening.

■ The effect of the reopening of the estate and of the grant of administration *de bonis non* was, we believe, unaffected by the order of final settlement. See 34 C. J. S., Executors and Administrators, § 921, page 1130, and 24 C. J., Executors and Administrators, § 2504, page 1042. Of course, all the limitations expressed in § 19-704, O. C. L. A., were applicable to the situation created by the appointment of a representative *de bonis non* to complete the administration; that is, claims barred by the statute of limitations could not be allowed, and approved claims could be paid only out of the available assets. The fact that an order of final settlement was entered in 1936 did not preclude the claimants from filing their claim after the entry of the order in 1939, provided that the claim was not barred by some other fact. Thus, the reopening afforded the claimants an opportunity to present their claim.

Section 19-704, O. C. L. A., says:

"No claim shall be allowed by the executor or administrator or the county court which is barred by the statute of limitations."

■ The contestants claim that that part of § 1-204, O. C. L. A., which fixes the limitation period as six years "upon a contract or liability, express or implied," is applicable to this claim. We have previously quoted from the letter written by Weber A. Hattrem.

when he was administrator of the A. Hattrem Estate, and in which he said:

"The estate of A. Hattrem is to assume or share equally with you in all expenses incident to the prosecution of said case, or that has already been incurred, and share equally with you in all profits accruing from said deal."

That letter contemplated a mutual account and a future adjustment for the purpose of ascertaining the general balance due. It is well established that the limitation period against a mutual, open account accrues only from the date of the last item: 34 Am. Jur., Limitation of Actions, § 159, page 125; and 37 C. J., Limitations of Actions, § 232, page 865. We believe that the limitation period did not begin to run until June 9, 1938, when the last advance was made: *Hickox v. Elliott*, 22 Fed. 13. We, therefore, conclude that the claim was timely filed and that its allowance was not barred by § 19-704, O. C. L. A.

■ Although an occasional word is said in the appellant's brief adverse to that part of the order which allowed interest, the brief contained no assignment of error upon that subject. Rule 2 of this court says:

"No alleged error of the circuit court will be considered unless regularly presented in the assignments of error."

We decline to consider these contentions.

The above disposes of all contentions advanced by the appellants. It does not mention all of the authorities which they cite, but all of them received careful consideration. In view of the repeated arguments made by the appellants that nothing is due to Roberts and Livesley on account of their advancements, we

read the record with care. Far from being drawn to a conclusion that nothing is due to those men, we reached the opinion that they dealt with the estate of their deceased partner fairly and honorably. They permitted his estate to be closed prematurely and thus made it possible for his bounty to reach his heirs sooner than would otherwise have been possible. In doing so they lost the opportunity of compelling the estate to bear a part of the advancements which they had made over a period of twenty years, in the event that the judgment in the Danciger case had been adverse. The record satisfies us that the father of the contestants had as partners men of honor.

The judgment order of the circuit court is affirmed. Costs and disbursements will be allowed to the claimants.